**LOCAL 453, INTERNATIONAL UNION OF ELECTRICAL, RADIO & MACHINE WORKERS, AFL–CIO, an Unincorporated Labor Organization, Plaintiff,**

v.

**OTIS ELEVATOR COMPANY, a Corporation, Defendant.**

United States District Court
S. D. New York.
Jan. 18, 1962.

Abramson & Lewis, New York City, for plaintiff (Leonard Greenwald, New York City, of counsel).

Guggenheimer & Untermyer, New York City, for defendant (Louis Newman, New York City, of counsel).

MacMAHON, District Judge.

This is a motion by a union, pursuant to Rule 65, Federal Rules of Civil Procedure, 28 U.S.C.A., for a preliminary injunction to compel an employer to comply with an arbitration award reinstat-

ing an employee discharged for violation of a company rule prohibiting gambling. The employee had been convicted for the knowing possession of policy slips upon the employer's premises during working hours. The main action seeks permanent enforcement of the award together with damages. Jurisdiction is grounded on the Labor-Management Relations Act, 29 U.S.C.A. § 185, and the United States Arbitration Act, 9 U.S.C.A. § 9.

▌ Injunctive relief before trial on the merits should be granted most sparingly. A strong showing of a reasonable probability of success in the main action and irreparable injury are indispensable prerequisites to the granting of such a drastic remedy. This is especially so where, as here, a preliminary injunction would not merely preserve the *status quo pendente lite*, but grant the party seeking it a substantial part of the ultimate relief obtainable after a successful trial. Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., Docket No. 26942 (2 Cir., December 18, 1961); Speedry Products, Inc. v. Dri Mark Products, Inc., 271 F. 2d 646, 648 (2 Cir. 1959). The court must, therefore, appraise the merits of this controversy to determine whether the union is entitled to the extraordinary equitable relief it seeks.

There is no dispute that a company rule prohibited gambling on the employer's premises under penalty of immediate discharge. Admittedly, the employee was discharged for violation of that rule following his indictment, prosecution, and conviction in the County Court of Westchester County for knowing possession of policy slips on the employer's premises during working hours. The union challenged "the propriety" of the employee's discharge, and after exhaustion of grievance procedures under a collective bargaining agreement, the parties submitted the dispute to arbitration.

Following hearings, the arbitrator found that the employee had knowingly violated the plant rule against gambling and as a result had been convicted of a crime. Nevertheless, and despite the absence of evidence indicating any other reason for the discharge, the arbitrator concluded that the employee had been discharged without just cause. As he saw it, the employee's misconduct called for disciplinary action, but discharge was too harsh a penalty in view of the hardship inflicted on the employee's wife and four children, his seniority, good record, punishment by the authorities, and the lack of any disciplinary action against four other employees whom the arbitrator, but not the authorities, felt were guilty of the same offense. Accordingly, he directed the company to reinstate the employee without back pay from the date of discharge.

The union contends that the award should be enforced because the arbitrator acted within the scope of his power under his honest interpretation of the collective bargaining agreement. The employer argues, however, that the award is unenforceable because the arbitrator exceeded his power by making a compromise decision that the employee's conceded misconduct warranted suspension, but not discharge.

▌ The threshold problem is whether the court has any business at all reviewing the merits of the arbitrator's decision, however bizarre or wrong it may be. Ordinarily, parties to an arbitration agreement will not be heard to complain about the result, if they have received what they bargained for. As a general rule, an arbitrator's decision is not open to judicial review, unless he has exceeded his power by deciding a matter not arbitrable under the contract or the submission. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1363, 4 L.Ed.2d 1432 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960).

The initial question, therefore, is whether these parties did agree to arbitrate the dispute involved. United Steelworkers of America v. Warrior & Gulf Navigation Co., supra. Accordingly, we must look to the terms of the collective bargaining agreement, and the stipulated question submitted for arbitration, to ascertain exactly what rights these parties designed for themselves, and whether the arbitrator acted within the scope of the power delegated to him.

The applicable provisions of the collective bargaining agreement are set forth in the margin.[1] The agreement gives the employer "the right to discharge any employee for just cause." The union, however, has "the right to challenge the propriety of the discharge" as a grievance. "All differences, disputes or grievances between the parties that shall not have been settled" by the grievance procedure "may be submitted to arbitration", and in such case, the decision of the arbitrator "shall be final and binding upon the parties but the arbitrator shall not have the power to add to, subtract from, or modify the terms" of the agreement.

When exhaustion of the grievance procedure failed to settle this dispute, the parties stipulated that the question for the arbitrator to decide was: "Has Joseph Calise been discharged for just cause, and if not what shall the remedy be?"

The agreement does not define what conduct constitutes "just cause" for discharge. Nor does it lay down any criteria governing "the propriety" of a discharge once the union lodges a grievance. Neither of the quoted terms has any definite meaning. Both are vague, general and flexible. They confer general rights, but neither the parties, nor the draftsmen, have troubled to tell us, or the arbitrator, exactly what those rights are, other than the right to differ about what constitutes "just cause" for discharge.

That both parties intended to leave room for differences of views about the matter is clear from the very fact that they expressly left ultimate resolution of disputes about it to an arbitrator unfettered with rigid criteria. Undoubtedly, certainty of meaning was consciously rejected in recognition of a need for flexible standards to facilitate *ad hoc* solution of each dispute on its own facts to promote the paramount objective of industrial peace. Obviously when this dispute arose, both parties so construed the agreement, otherwise there was no point whatever in submitting anything to arbitration, for there was not the slightest question about the misconduct involved. Yet, they freely stipulated that the arbitrator should decide whether the employee had "been discharged for just cause, and if not what shall the remedy be?" Words could hardly make clearer the arbitrator's power to decide the only real dispute, that is, whether the conceded misconduct was just cause for discharge, or whether milder disciplinary action was more appropriate.

Lest doubt remain as to who should have the last word on any differences that might conceivably arise as to

1. Article IX provides:

"Section 11. The Employer shall have the right to discharge any employee for just cause. The Union shall have the right to challenge the propriety of the discharge of any employee, except a probationary employee, and any such discharge shall be considered a grievance to be dealt with in accordance with the grievance procedure heretofore set forth in Article V. Employees discharged without just cause shall receive pay for all lost time unless an arbitrator rules otherwise."

Article V provides various steps for negotiating grievance settlements, and Article VI provides:

"Section 1. All differences, disputes or grievances between the parties that shall not have been settled after following the procedure set forth in Article V, may be submitted to arbitration upon notice of either party to the other party * * *.

"Section 2. The decision of such arbitrator shall be final and binding upon the parties but the arbitrator shall not have the power to add to, subtract from, or modify the terms of this Agreement, or any Agreement supplemental thereto * * *."

what the parties intended by the general terms employed, the agreement expressly empowers the arbitrator to make a final and binding decision on "All differences, disputes or grievances" between the parties. Surely such a plenary grant carries power to interpret the contract. It also brings into play the rule requiring that all doubt as to an arbitrator's power to settle a dispute should be resolved in favor of coverage. United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. at 582–583, 80 S.Ct. 1347.

The employer argues, however, relying on Textile Workers Union of America, etc. v. American Thread Co., 291 F. 2d 894 (4 Cir. 1961), that when the union challenges a discharge for lack of just cause, the arbitrator's power is limited, under the terms of both the agreement and the submission, to deciding whether the employee was in fact discharged for just cause, or for some other reason. Otherwise, the employer urges, the right to discharge for just cause is no right at all, but an illusory opportunity to chance the outcome of arbitration. These arguments are plausible and, indeed, might have validity if the agreement had defined "just cause" or provided that violation of a company rule would be sufficient, or if the stipulation had focused the issue on whether the alleged misconduct had in fact occurred, rather than on whether it constituted "just cause" for discharge, or some other remedy.

The court must take the agreement and the stipulated submission as the parties made them. Both squarely put the question of what constitutes "just cause" for discharge up to the arbitrator. We think it plain, therefore, that the collective bargaining agreement, read with the question submitted, does empower the arbitrator to settle the dispute involved.

The employer urges, nonetheless, that the commission of a crime by an employee upon the employer's premises is just cause for discharge as a matter of law. Of course, it is. National Labor Relations Board v. Federal Bearings Co., 109 F.2d 945 (2 Cir. 1940). Nevertheless, the court is foreclosed from considering that question, for the arbitrator is the last word, even on questions of law, once the parties have granted him final power to decide all differences and disputes between them. Philadelphia Dress Joint Board v. Rosinsky, 134 F.Supp. 607, 612 (E.D.Pa.1955), aff'd, 229 F.2d 438 (3 Cir. 1956); Carey v. Westinghouse Electric Corp., 6 A.D. 2d 582, 180 N.Y.S.2d 203 (1st Dept. 1958), aff'd, 6 N.Y.2d 934, 190 N.Y.S.2d 1003, 161 N.E.2d 216 (1959).

Ordinarily, this would close our inquiry, whether or not we agree with the arbitrator's decision. United Steelworkers of America v. Enterprise Wheel & Car Corp., supra. Here, however, compelling reasons dictate a different course.

The misconduct involved here was not just an infraction of a company rule. It was a crime. The knowing possession of policy slips was, and still is, a misdemeanor under the law of New York. N. Y. Penal Law, McKinney's Consol. Laws, c. 40, § 974. The same statute which prohibits possession of policy slips also provides that a "person who * * * is the owner of any place * * * where policy playing or the sale of what are commonly called 'lottery policies' is carried on with his knowledge or after notification that the premises are so used, permits such use to be continued, or who aids, assists, or abets in any manner, * * * is a common gambler, and guilty of a misdemeanor." Responsibility for observance of that aspect of the New York Penal Law rests squarely upon the owner of the premises —the employer. To deny him the power to discharge for the commission of such a crime upon his property exposes him to criminal prosecution.

Furthermore, this was not just a friendly wager. This was organized professional gambling. Calise not only kept policy slips in his possession, but also had four other employees working for

him. Policy, along with bookmaking, is regarded by responsible law enforcement officials, state and federal, as the incubator of most, and more sinister, organized crime.[2]

These unmistakeable pronouncements of the public policy against organized gambling cannot be lightly brushed aside merely because an arbitrator feels that discharge is too harsh. Were we to do so, the next arbitrator, moved by like compassion, could conclude with equal validity that no crime by an employee, however serious or injurious to the employer, would constitute just cause for discharge.

However inviolable the teaching that courts keep their hands off arbitration awards, they are not edicts proclaimed by divine right. Arbitrators are creatures of contract. They are no more above public law than the parties from whom they derive their powers.

■ Thus, a collective bargaining agreement may well give an arbitrator power to dispense his own brand of industrial justice, but the contract, and his power under it, are limited by, and must yield to, overriding public policy. This award clashes with that policy. It indulges crime, cripples an employer's power to support the law, and impairs his right to prevent exposure to criminal liability. The award is, therefore, void and unenforceable. Black v. Cutter Laboratories, 351 U.S. 292, 76 S.Ct. 824, 100 L.Ed. 1188 (1956); Hurd v. Hodge, 334 U.S. 24, 34–35, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); Matter of Western Union Tel. Co., 299 N.Y. 177, 86 N.E.2d 162 (1949); Avco Corp. v. Preteska, 22 Conn.Sup. 475, 174 A.2d 684 (June 30, 1961, Conn. Superior Ct., Fairfield County).

■ Finally, equity is rooted in conscience. An injunction is an extraordinary remedial process which is granted, not as a matter of right but in the exercise of sound judicial discretion, and, then, only upon a clear showing of irreparable injury. No such injury is shown here.

Balancing the equities in the light of the undisputed facts—the stark absence of any legitimate labor objective, the soiled hands of the beneficiary, and the risk to the employer—, it would be unconscionable to grant extraordinary

---

2. In the February 1961 report of the New York State Commission of Investigation, entitled "Syndicated Gambling in New York State," the Chairman had this to say about organized gambling:

"Syndicated gambling operated by professional criminals is widespread in New York State today. These syndicated gambling activities are the 'treasury of the underworld' or, as I have sometimes described it, 'the bread and butter of organized crime,' and these activities provide fantastic sums which feed and finance other illegal activities such as the narcotics racket, labor racketeering and bootlegging." (p. 114)

In this same report, policy slip operations were particularly condemned:

"Because policy appeals to the lowest income group and because it necessitates personal contact and volume play between bettors and runners, it is confined to heavily populated areas where organized criminal control is more evident. As a result, even more than bookmaking, it is regulated by the minions of organized crime." (p. 62)

In the same vein, the Temporary Commission of Investigation of the State of New York, in its "Second Annual Report" of February 1960, characterized organized gambling as "the major law enforcement problem of this State" (p. 76), and in its February 1961 report on the summary of its activities during 1960 concluded "that the best way to cripple organized crime would be to suppress gambling" (p. 25).

Similarly, the federal government has recognized that organized crime depends on organized gambling. Former Attorney General William P. Rogers stated: "The biggest source of money feeding organized crime is that most tolerated of all crimes —gambling." 106 Cong.Rec. 2159. Robert F. Kennedy, the present Attorney General, reiterated the belief that organized racketeering can be curbed most effectively by federal action aimed at eliminating illegal professional gambling. 1961 U.S.Code Cong. & Adm.News, p. 2635. Congress responded by outlawing the interstate communication of wagering paraphernalia. 18 U.S.C. §§ 1084 and 1953 (added August 1961).

equitable relief in this sullied cause. Surely equity should not become privy to law-breaking by lending its aid to enforce an arbitration award which blinks realities, indulges crime, and offends public policy. An injunction, in these circumstances, would be tantamount to granting policy operators a license to violate the law and exploit defendant's employees. However enlightened the views of the arbitrator, or loose the rules of industrial justice, it is not the conscience of the Chancellor to fashion such an improvement in the working conditions of those engaged in the numbers racket.

Accordingly, the motion for a preliminary injunction is in all respects denied. This opinion shall constitute the court's findings of fact and conclusions of law. So ordered.