**UNITED GAS CORPORATION,**
**Plaintiff,**

v.

**PENNZOIL COMPANY and White Weld**
**& Co., Defendants.**

United States District Court
S. D. New York.

Dec. 18, 1965.

Ralph M. Carson, E. Deane Leonard, Richard E. Nolan, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendant Pennzoil Co., Whitney North Seymour, Richard D. Jones, John C. Meleney, New York City, of counsel.

Shearman & Sterling, New York City, for defendant White Weld & Co., Michael J. De Santis, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge:

Plaintiff United Gas Corporation (United) moves for a preliminary injunction restraining defendant Pennzoil Company (Pennzoil) from acquiring ten percent or more of the outstanding common stock of United or, in the alternative, from voting such shares if acquired. The complaint seeks a permanent injunction of the same nature.

United is a Delaware corporation with its principal place of business in Louisiana. Pennzoil is a Pennsylvania corporation with its principal place of business in that state. Defendant White Weld & Co. (White Weld) is an investment banking partnership with its principal offices in New York. It is named as a defendant because it is the designated dealer manager in the purchase program by which Pennzoil seeks to acquire United stock.

Jurisdiction is asserted both under § 25 of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79y and, by reason of diversity, under 28 U.S.C. § 1332.

*Facts*

The basic facts, virtually undisputed, are as follows:

United and its subsidiaries are engaged in the production, transportation and sale of oil and natural gas in the southern United States, including the sale of natural gas at retail to consumers in Texas and other southern states. Its gas distribution system, supplied by its producing and pipeline subsidiaries, is a "gas utility company" within the meaning of the Public Utility Holding Company Act,

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for plaintiff,

15 U.S.C. § 79b(a) (4). Among other subsidiaries are U.G.C. Instruments, a manufacturer of electronic devices used primarily in the gas and oil industry; Atlas Processing, a refiner of petroleum products; and Duval Corporation,[1] which is engaged in mining and milling copper, potash, sulphur and other minerals. United has outstanding 12,686,000 shares of common stock traded on the New York Stock Exchange.

Pennzoil is engaged in the production and refining of crude oil, the marketing of motor oils, lubricants and other petroleum products, and the exploration for and production of oil and natural gas in the United States and foreign countries.

In October 1965 Pennzoil owned 275,-000 shares of United common stock which it had acquired under an investment program initiated in May of 1965. On November 22, 1965 Pennzoil made a public offer to the United common stockholders to purchase a minimum of one million shares of United common at $41 per share. As of that date United was selling at 35¾ on the open market. The offer was to expire on December 14, 1965 but could be extended by Pennzoil to December 27, 1965 or any intermediate date.

Under the terms of the offer Pennzoil agrees to purchase one million shares if that number or more are tendered and, at its election, may purchase any or all shares tendered in excess of one million. Purchases are to be made in order of tender. If less than one million shares are tendered Pennzoil may buy all but not less than all of these shares but is not obligated to do so. Pennzoil is required to designate the number of shares its elects to purchase and make such purchases by December 30, 1965.

The response to the Pennzoil offer was much greater than anticipated. By December 7, 1965, 4,982,096 out of the 12,-868,982 shares outstanding had been tendered to Pennzoil. Additional shares were being tendered thereafter.

Pennzoil has arranged bank financing for funds sufficient to purchase some 3,000,000 shares and anticipates additional financing for any shares it may desire to purchase in excess of that amount. If all shares thus far tendered are acquired the total purchase price will amount to some two hundred million dollars.

Under § 2(a) (7) of the Public Utility Holding Company Act, 15 U.S.C. § 79b (a) (7), by the purchase of at least 10% of the stock of United, Pennzoil would in all likelihood become a holding company required to register with the S.E.C., 15 U.S.C. § 79e. Pennzoil and United would then be subject to regulation under the Act with a variety of possible consequences, including the possible divestiture of some or all of United's non-utility subsidiaries. A purchase by Pennzoil of one million shares of United would give it holdings of 9.9% of the outstanding shares, just under the minimum 10% figure bringing it under the Act. If all of the shares tendered by December 7, 1965 were purchased Pennzoil would have a 39% stock interest in United. For all practical purposes this would be a controlling interest.

On December 1, 1965 United commenced this action to restrain Pennzoil from acquiring 10% or more of its stock and by order to show cause brought on this motion for a temporary injunction for the same relief pending the determination of the action. At the hearing of the motion before me on December 10 Pennzoil, at my suggestion, agreed, as it had the election to do, to extend its offer to December 17, 1965 and not to exercise its option to purchase any of the tendered United shares until after that date.

*Issues.*

United urges, as I understand its argument, that it is entitled to injunctive relief against the Pennzoil acquisition on the following interrelated grounds:

(1) The projected acquisition of 10% or more of United stock by Pennzoil

---

1. 76% stock interest owned by United.

would create a public utility holding company structure which is contrary to declared Congressional policy.

(2) If United through the Pennzoil stock acquisition were brought under the Public Utility Holding Company Act, its present corporate structure would be in violation of specific provisions of the Act and thus the acquisition would necessarily have an illegal result.

(3) If United were brought under the Act, it would be required to divest itself of valuable non-utility subsidiaries and would be subjected to other regulatory supervision by the S.E.C. to the irreparable damage of the corporation and its stockholders.

(4) If United were brought under the Act and thus subjected to damage and loss through the divestiture of its subsidiaries and otherwise, the proposed acquisition would be a violation of the fiduciary obligations which would be owed to United and its remaining stockholders by Pennzoil in its position as controlling shareholder.

Pennzoil urges that each of these contentions and, indeed, the entire action, is devoid of merit. It contends in substance that it has the absolute right to make the purchase of United stock which it contemplates; that the acquisition will result in no violations of law; that United has made no showing of irreparable damage resulting from the acquisition, and that none of the prerequisites for issuance of a preliminary injunction have been established.

**I.**

United's first contention is that the court should enjoin the Pennzoil acquisition because it would create a corporate structure contrary to public policy as announced by Congress 'in § 1 of the Public Utility Holding Company Act.[2]

If, as is highly probable, the contemplated stock acquisition would make Pennzoil a public utility holding company and thus bring Pennzoil and United within the purview of the Act, that fact, standing by itself, is plainly insufficient to show that the acquisition would violate public policy or would be illegal in any respect.

The Act was not designed to, nor did it, sound the death knell for public utility holding companies. It does not proscribe such companies nor make them illegal. It does not establish any per se rule forbidding the creation of a holding company structure.

On the contrary, the Act recognizes public utility holding companies as lawful. What it does do is to prescribe limitations and restrictions on their structure and operations, place them under a comprehensive regulatory scheme, and vest the S.E.C. with regulatory authority over them.

What United urges here, however, is that the very nature of its particular corporate set-up is such that it would be contrary to the declared public policy of the Act for United to become part of a public utility holding company structure. United's argument is based on a misapprehension of the nature and purposes of the Act and the regulatory scheme which Congress has provided to enforce its provisions.

As the objectives state, the Act was directed against "abuses" by public utility holding companies which had become "persistent and wide-spread." It was

---

2. 15 U.S.C. § 79a(c) declares: "When abuses * * * become persistent and wide-spread the holding company becomes an agency which, unless regulated, is injurious to investors, consumers, and the general public; and it is declared to be the policy of this chapter, in accordance with which policy all the provisions of this chapter shall be interpreted, to meet the problems and eliminate the evils as enumerated in this section, connected with public-utility holding companies * * *; and for the purpose of effectuating such policy to compel the simplification of public-utility holding-company systems and the elimination therefrom of properties detrimental to the proper functioning of such systems, and to provide as soon as practicable for the elimination of public-utility holding companies except as otherwise, expressly provided in this chapter."

declared to be the policy of the Act to meet these problems and eliminate the evils involved. The purposes were to be effectuated by compelling the simplification of public utility holding company systems and by providing for elimination of such companies "except as otherwise expressly provided" in the legislation.

The Act sets up the machinery for carrying out these objectives by vesting in the S.E.C. the broad power to determine what simplification of structure and other restrictions are necessary to enforce the provisions of the Act against a registered utility or holding company. As I will point out in detail later, the S.E.C., after administrative proceedings enabling it to ascertain the facts in each particular case, and affording a full and fair hearing to all parties in interest, is given wide discretion in making its determinations.

In the case at bar United seeks to have this court, before any of the procedures provided by the Act have been or, indeed, could be invoked, predetermine the very matters which Congress has expressly directed should be entrusted to the S.E.C. Were the court to follow that course it would be usurping the functions of the S.E.C. and flying in the face of the congressional mandate. Such a course is quite beyond the powers of this court, equitable or otherwise and, indeed, would be basically unsound.

There is no merit in United's contention that the acquisition should be enjoined because it is contrary to the declared policy of the Act.

## II.

 United's second contention is that the acquisition should be enjoined because it would necessarily result in violation of §§ 2, 4 and 11 of the Public Utility Holding Company Act, 15 U.S.C. §§ 79b, 79d, 79k. Since the probabilities are that the acquisition would make

Pennzoil, as the owner of 10% or more of United stock, a holding company under § 2, and thus require registration under § 4, it is argued (1) that *eo instante* with the consummation of the purchase the resultant corporate structure would be unlawful because unregistered; and (2) that the simplification provisions of § 11 would forbid ownership by United of certain of its interests, principally its mining subsidiary Duval.

This position is not unlike United's earlier argument and is also based on a misapprehension of the nature of the statute and its regulatory scheme.

First, it is plain that Pennzoil has every intention of complying with the registration provisions of § 4. If, as can be assumed, that section is promptly complied with no illegality can result from the mere fact that Pennzoil has become a holding company.

Second, the Act does not provide that the ownership or control of non-utility subsidiaries by a holding company is illegal per se. Instead, the regulatory body charged with administration and enforcement is vested with the power to determine whether, when and under what circumstances simplification of corporate structure or divestiture of subsidiaries is necessary in order to conform to the purposes and requirements of the Act.

Initially, there may be a question of whether the exemption features of the Act should be called into play.[3] Apart from this, § 11, 15 U.S.C. § 79k(b) (1), the divestment provision, declares that

"it shall be the duty of the Commission * * * [t]o require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of

---

3. In limited situations 15 U.S.C. § 79c authorizes the S.E.C. to declare a company exempt where compatible with the "public interest." See also 15 U.S.C. § 79b (7). In support of the motion the affidavit of United's president states that it would be "most improbable" that an exemption would be granted under the present circumstances. The fact is, however, that this is a determination to be made by the S.E.C.

the holding-company system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system * * *."

The Commission is given wide discretion:

"[It] may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems." 15 U.S.C. § 79k(b) (1).

From a reading of § 11 it can by no means be assumed that the S.E.C. in administering the provision would find that subsidiary properties of United were not "reasonably incidental, or economically necessary or appropriate" to the operations of its gas utility system and thus order divestiture. Many of the companies subject to regulation under the

Act are currently permitted to hold non-utility subsidiaries.[4]

Furthermore, as the cases indicate [5] the question of whether United should be permitted to retain its interest in subsidiaries involves a detailed factual inquiry into functional relationships within the corporate structure. It requires a scrupulous examination of the organization and method of operations of the complex organism comprising United and its subsidiaries. Issues of this nature are peculiarly suitable for administrative determination and Congress has directed that these issues should be decided by the S.E.C. The Act does not contemplate that there shall be a premature decision on these questions by the courts, and, indeed, it would be unwise for the judiciary to undertake such a pre-determination, particularly on a motion of this character.[6]

Far East Conference v. United States, 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1951), which delineates the principles of primary jurisdiction,[7] contains language which is particularly instructive here:

"[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject mat-

4. 30 S.E.C. Ann.Rep. 87 (1964) states that "At the close of the fiscal year there were 24 holding companies registered under the Act. Of these, 18 are included in the 16 remaining holding-company systems which are herein classified as 'active registered holding-company systems.' 2 of the 18 being subholding companies in these active systems. The remaining 6 registered holding companies are of relatively small size and are excluded from the active holding-company systems. In the 16 active systems there are 84 electric and/or gas utility subsidiaries, *41 nonutility subsidiaries,* and 12 inactive companies, or a total, including the 18 parent holding companies, of 155 system companies." (Emphasis added; footnotes omitted.)

5. E.g., North American Co. v. S.E.C., 133 F.2d 148, 152–153 (2 Cir. 1943), aff'd, 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945

(1946); United Gas Improvement Co. v. S.E.C., 138 F.2d 1010 (3 Cir. 1942); United Light & Railways Co., 35 S.E.C. 516, 519 (1954); General Pub. Util. Corp., 32 S.E.C. 807, 839–40 (1951); North American Co., 32 S.E.C. 169, 181–83 (1950); Pennsylvania Gas & Elec. Corp., 28 S.E.C. 553 (1948); Philadelphia Co., 28 S.E.C. 35 (1948).

6. In any event the papers before me on this motion do not present sufficient facts on which a determination could be made that the divestiture of any of United's properties as detrimental to the proper functioning of the system would be required under the Act.

7. See United States v. Western Pacific R.R., 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Schwartz v. Bowman, 244 F.Supp. 51, 65–66 (S.D.N.Y. 1965).

ter should not be passed over. This is so even though the facts after they have been apprised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

United urges that cases such as American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387 (S.D. N.Y.1957), aff'd, 259 F.2d 525 (2 Cir. 1958); Hamilton Watch Co. v. Benrus Watch Co., 114 F.Supp. 307 (D.Conn.), aff'd, 206 F.2d 738 (2 Cir. 1953); and Standard Fruit & Steamship Co. v. Midwest Stock Exchange, 178 F.Supp. 669 (M.D.Ill.1959), sustain its contention that it is entitled to injunctive relief here. In these decisions an injunction was granted to prevent an imminent violation of a statutory prohibition. They are markedly distinguishable from the case at bar and the distinctions point up the reasons why injunctive relief is inappropriate in the present circumstances.

The necessary predicates of all of these cases—an imminent violation of a statutory prohibition and the necessity of immediate judicial intervention to prevent irreparable harm—are not present here. The American Crystal Sugar and Hamilton Watch cases involved impending violations of § 7 of the Clayton Act, 15 U.S. C. § 18, which prohibits acquisition by a corporation of stock of another where "the effect of such acquisition may be substantially to lessen competition." The conduct enjoined there necessarily would have resulted in a violation of the statutory prohibition of § 7 and no other remedy was available to the plaintiff.

Standard Fruit & Steamship Company was an action to enjoin a stock exchange from trading in plaintiff's shares on an unlisted basis in violation of § 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l. The S.E.C. had refused to provide the protection which the plaintiff sought and, indeed, as amicus, supported defendant's position that the proposed course of conduct would not offend the applicable statute and regulation. The court, finding that the defendant's contemplated action was probably unlawful, took measures to prevent imminent and disastrous disruption of the over-the-counter market for plaintiff's securities.

In the case at bar, however, as I have pointed out, there are no statutory prohibitions against the structure resulting from the Pennzoil acquisition. And responsibility for the initial decision as to whether any changes in United corporate structure will be required by the Public Utility Holding Company Act, and if so how such changes should be made, has been placed by Congress in the hands of the S.E.C. as the duly constituted regulatory body.

United has not shown that injunctive relief is required to prevent violations of the Public Utility Holding Company Act.

### III.

Apart from questions of resulting illegality United urges that a preliminary injunction nevertheless should be granted to prevent irreparable damage which would follow from the application of the Act's regulatory provisions.

In the first place I am unable to discern that any cognizable legal rights of United have been or will be impinged upon by the contemplated purchase.

It is true that if the acquisition is made United will probably become subject to the Holding Company Act.[8]

---

8. It may be noted that Pennzoil has suggested several alternatives to permanent subjection to the provisions of the Act.

Though it is unlikely that Pennzoil will choose to acquire less than 10% of United's stock, other suggested alterna-

But this, in my view, does not encroach upon any of its legal rights nor does it restrict the legal right of Pennzoil freely to purchase stock that is offered.

There is no right to be free from public regulation. However distasteful it may be to the United management, federal regulation per se is not a ground on which injunctive relief can be granted. The prospects that United "would be required to make detailed reports and keep burdensome accountings;" that "its freedom to select its directors would be circumscribed;" that "the retention of certain of its present directors would be illegal;" [9] or even that simplification of its corporate structure would be required, are risks which flow from the availability of its corporate stock for purchase and the changes which might ensue therefrom.

An established corporate structure is not immune from change by legal means. If corporate stock is available for purchase it can be expected that there will be change of stock ownership and, indeed, change of control. The mere fact that the changed circumstances brought about by a change of stock ownership will subject a corporation to federal regulation does not restrict another corporation from exercising its legal rights to make a legitimate stock purchase. No claim is made here that Pennzoil's purchase offer is in any way unfair to the United stockholders who have tendered their stock or that there has been any conduct on Pennzoil's part which would smack of deception or overreaching.

In the second place, even if regulation led to divestiture of Duval or other United subsidiaries, it does not follow that any injury, much less irreparable injury, would result. The Act scrupulously protects stock interests of a parent in divested subsidiaries. Section 11(e), 15 U.S.C. § 79k(e), provides:

"In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of section (b) and *fair and equitable to the persons affected by such plan*, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce and carry out the terms and provisions of such plan." (Emphasis added.)

In practice divestments under the Act have not led to a loss of values. 10 S.E.C. Ann.Rep. 89, 91; 92 (1944). Indeed, security holders may reap a benefit. Ibid. In North American Co. v. S. E. C., 327 U.S. 686, 709–710, 66 S.Ct. 785 (1945), the Supreme Court, in upholding the constitutionality of § 11, declared:

"[T]here is no basis here for assuming that in limiting the scope of North American's operations there will be dispositions of securities for inadequate considerations, thereby

---

tives might avoid the necessity of permanent registration under the act, i.e., United could dispose of its retail distribution facilities by spin-off or by sale to third parties; Pennzoil and United could be consolidated into a new corporation, or either of them could be merged into the other.

9. Brief for plaintiff, p. 13.

raising a question as to whether there is a destruction of these values without just compensation. The Act does not contemplate or require the dumping or forced liquidation of securities on the market for cash. Under §§ 11(d) and 11(e) of the Act, any divestment or reorganization plan must meet the standards of fairness and equitableness. In many instances this may involve no more than a distribution of the securities among the existing shareholders of the holding company. But should securities be sold for cash, speculation as to unfavorable market conditions cannot undermine the validity of § 11(b) (1). Any plan of divestment or reorganization, moreover, must be carefully scrutinized by both the Commission and the enforcing court, thus enabling the assertion and protection of all shareholders' rights. See Otis & Co. v. Securities & Exchange Commission, 323 U.S. 624 [65 S.Ct. 483, 89 L.Ed. 511]. And there are provisions in the Act guarding against unduly rapid divestment or liquidation."

United has failed to show that a preliminary injunction should issue because regulatory supervision under the Act would constitute an imminent invasion of its legal rights or would cause it irreparable damage.

### IV.

 United finally makes the ingenious suggestion that the proposed acquisition should be enjoined because it would be likely to result in a breach of fiduciary obligations owed to United and its shareholders by Pennzoil as a controlling, or prospective controlling, shareholder.

There can be no quarrel with the familiar proposition that a controlling stockholder has the fiduciary obligation to exercise its powers in a manner consistent with the best interests of the corporation and its fellow shareholders. See, e. g., Southern Pacific Co. v. Bogert, 250 U.S. 483, 491–492, 39 S.Ct. 533, 63 L.Ed.

1079 (1919); United States v. Union Pacific Rd. Co., 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124 (1912); Lebold v. Inland Steel Co., 125 F.2d 369 (7 Cir. 1941), cert. den., 316 U.S. 675, 62 S.Ct. 1045, 86 L.Ed. 1749 (1942); Globe Woolen Co. v. Utica Gas & Elec. Co., 224 N.Y. 483, 121 N.E. 378 (1918). Nor is there any serious doubt that the acquisition would place Pennzoil in a fiduciary position vis-a-vis United and its other shareholders, if it is not already in that position.

But I cannot agree, as United seems to argue, that Pennzoil would commit a breach of its fiduciary obligations simply by concluding the acquisition, thus subjecting United to the provisions of the Act and simultaneously initiating a chain of events which could ultimately lead to the divestiture of United subsidiaries.

Certainly the mere subjection of United to regulation does not constitute a breach of Pennzoil's fiduciary obligation. Whether divestiture will be required is wholly undetermined and undeterminable now. Even if divestiture should occur there is no probability of damage, as experience under the Act indicates. There is no basis for concluding that fiduciary obligations will be violated on these grounds.

 United also claims to have some apprehension that since Pennzoil contemplates the possibility of a merger as an alternative to continued regulation under the Act, the acquisition would lead to a breach of Pennzoil's fiduciary obligations as controlling stockholder. But I cannot assume that should some form of merger be concluded, Pennzoil will be other than scrupulous in observing its fiduciary obligations. I see no basis for enjoining a party from taking action which would entail the assumption of fiduciary obligations merely upon the ground that this would give it the power to commit wrongs in violation of these obligations if it were so minded. There is not a scintilla of evidence here from which it could be concluded that Pennz-

oil intends to commit any wrongs or would be likely to do so.

No injunctive relief can be granted on what are mere speculations. There will be ample remedies available to United and its shareholders if and when some wrong or injury in breach of fiduciary obligations should be threatened.

### Conclusion

I conclude that United has not shown grounds for the preliminary injunctive relief which it seeks on this motion.

1. The projected acquisition of United stock by Pennzoil does not threaten to violate any statutory prohibition or to result in other illegality.

2. It has not been demonstrated that the acquisition will impinge upon any clear legal rights of United. See Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't Stores, Inc., 299 F.2d 33, 1 A.L.R. 3d 752 (2 Cir. 1962).

3. It does not appear that there is any substantial prospect that United will ultimately succeed on the merits of the action. Hall Signal Co. v. General Ry. Signal Co., 153 F. 907 (2 Cir. 1907); Nadya, Inc. v. Majestic Metal Specialties, Inc., 127 F.Supp. 467 (S.D.N.Y.1954).

4. There has not been a showing of probable irreparable injury if injunctive relief is not granted. Behre v. Anchor Ins. Co., 297 F. 986, 989 (2 Cir. 1924); Local 453, Electrical Workers v. Otis Elevator Co., 201 F.Supp. 213 (S.D.N.Y. 1962); Rule 65, F.R.Civ.P.

5. Finally, it does not appear that the equities are sufficiently balanced in United's favor to justify preliminary injunctive relief. See Hamilton Watch Co. v. Benrus Watch Co., supra, 206 F.2d at 740; Foundry Services, Inc. v. Beneflux Corp., 206 F.2d 214, 216 (2 Cir. 1953).

Issuance of a preliminary injunction would make it unlikely that the tender offer, in which Pennzoil has a large stake and for which it has made heavy financial commitments, could be carried out. The tendering stockholders of United might well be deprived of their rights to dis-pose of their United stock at prices which they evidently consider advantageous. Any harm which United might suffer from a denial of preliminary relief does not outbalance the harm which would result to Pennzoil and the tendering United stockholders were it granted.

The motion of United for a preliminary injunction is therefore in all respects denied.

The foregoing opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a), F.R.C.P.

It is so ordered.