Esther R. Warshaw, Plaintiff Below,
Appellant,

*vs.*

W. K. Calhoun, Charles F. Curry, F. W. Duboc, Ray B. Duboc, Robert M. Duboc, W. L. Gench, John Latshaw, K. H. Mead, C. C. Otto, Western Casualty and Surety Company, a Kansas corporation, and the Western Insurance Securities Company, a Delaware corporation, Defendants Below, Appellees.

*Supreme Court, On Appeal, June 3, 1966.*

*Leroy A. Brill,* of Bayard, Brill, Russell & Handelman, Wilmington, Laventhall & Zicklin and Javits Trubin Sillcocks Edelman & Purcell, New York City, for appellant.

*Henry M. Canby* and *Richard J. Abrams,* of Richards, Layton & Finger, *Richard L. McMahon,* of Berl Potter & Anderson, Wilmington, and Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for appellees.

WOLCOTT, Chief Justice, CAREY, Justice, and STIFTEL, Judge, sitting.

WOLCOTT, Chief Justice: This is an appeal by the plaintiff from a summary judgment entered by the Chancellor for the defendants. The plaintiff brought an action as a stockholder of The Western Insurance Securities Company ("Securities") naming as defendants Securities, The Western Casualty and Surety Company ("Casualty") and certain of the officers and directors of both companies. The record before us consists of pleadings, depositions, answers to interrogatories, and produced documents.

Casualty was initiated in 1910 and, in 1922, the Duboc-Gordon interests acquired control of it and incorporated it as a Kansas Corporation, retaining about 92% ownership. It is a rapidly growing insurance company selling casualty insurance.

In 1925 the Duboc-Gordon group organized Securities for the purpose of controlling Casualty. Upon the organization of Securities, Duboc and Gordon exchanged their shares in Casualty amounting to

about 92% of the Casualty stock for shares in Securities. In addition, Securities acquired some additional shares of Casualty with the proceeds of the sale of its own stock. Since the organization of Securities the Duboc-Gordon group has continued to control it, in fact, owning about 55% of Securities' outstanding stock. Securities has never owned any substantial asset other than its controlling ownership of Casualty. Securities has never had any appreciable income except dividends received upon its Casualty stock.

In the 1930's, Casualty dividends were reduced and Securities became delinquent on its Class A and preferred stock. These arrearages were discharged in May, 1959, and in December of that year dividend payments were resumed upon its common stock.

Securities is a holding company. It has kept its operating expenses to a minimum. No salaries are paid its officers and its operating expenses are taxes paid on dividends received and the cost of distributing dividends and information to stockholders.

Because of the stock ownership of the Duboc-Gordon group (55%), Securities is classified under the Internal Revenue Code for income tax purposes as a personal holding company. As a result of this classification, retained earnings by Securities are subjected to a tax which is at such a rate as to make the retention of any of its earnings by Securities prohibitive. Accordingly, since its classification as a personal holding company, Securities has made it a practice to pay out almost all of its earnings to its stockholders. With a minor exception, it has not increased its numerical holding of the stock of Casualty.

The stock of Securities has always sold at a discount from the value of the Casualty stock lying behind it. This discount has varied over the years between 25% and 50% although currently the percentage of discount has declined.

Plaintiff purchased her stock in Securities in 1954, making subsequent purchases in 1956 and 1959. At the time she made her purchases she was aware that she was purchasing stock in a holding company controlled by the Duboc-Gordon group. She knew the Securities stock was selling at a substantial discount from the value

of its underlying assets. She was aware that there were arrearages in dividends on the Class A and preferred stock which were being reduced annually, and she know that no dividends were being paid on the common stock because of the arrearages.

Some of the individual defendants here are directors of both Securities and Casualty. In addition, Ray Duboc is the President of Securities and Chairman of the Board of Casualty. Securities' directors, who are also officers and directors of Casualty, receive salaries from Casualty.

In 1945 and 1950 a small increase in the capital of Casualty had been accomplished in order to meet reserve requirements by selling Casualty shares through a public undertaking through a local Kansas City brokerage house. But in 1953 it became apparent that Casualty must obtain substantial additional financing in order to meet the accepted standard of a proper ratio between premiums and capital, and to broaden the public ownership of its stock.

Upon the recommendation of the Kansas City brokerage house which was unable to accept the underwriting, Casualty approached Kidder, Peabody & Co. for this purpose. Negotiations were carried on between Ray Duboc on behalf of Casualty and a representative of Kidder, Peabody. Ultimately, the additional financing was obtained by effecting a stock split of Casualty stock with a set price of $23 per share for the new issue. This was offered to the public through Kidder, Peabody.

Securities, which at the time owned approximately 92% of the Casualty stock, did not accept its rights to subscribe to the new Casualty stock for a number of reasons. It was without funds to take up the stock rights. At the time it was still in dividend arrears upon its Class A and preferred stock. If it had exercised its rights, there would have been insufficient stock available for public subscription which would have defeated the purpose of establishing a public market for Casualty stock. This same result would have followed had Securities offered the rights to subscribe to the new Casualty stock to its relatively small number of shareholders. If Securities accepted its rights to subscribe to Casualty stock, an additional burden would have been placed upon the underwriters of guarantying the price of the

entire new issue of Casualty stock during the period allotted for the exercise of the rights. This would have resulted in increased cost of financing and might even have jeopardized the entire underwriting. Accordingly, in consideration of these reasons the underwriter insisted that an integral part of the underwriting be that Securities abandon its right to subscribe to the new Casualty stock. The directors of Securities agreed and transferred the rights of Securities to subscribe to Kidder, Peabody for a nominal consideration. The result of the abandonment of Securities' right to subscribe to the 1954 Casualty stock was to dilute the percentage ownership of Securities in Casualty.

In 1959 further financing of Casualty was required and the 1959 plan substantially followed the 1954 plan. Again, by reason of the fact that the retainment of earnings was prohibitive to Securities it found itself in no position to exercise its rights to subscribe to the new Casualty stock. Also, again Kidder, Peabody desired the neutralization of Securities' rights to subscribe as essential to the success of the underwriting. A price was established for the new Casualty stock which resulted in the placing of a purely minimal value on the rights, themselves, and no market in fact developed for such rights. The negotiations leading to the issue of 1959 were again carried on by Duboc and a representative of Kidder, Peabody. Again, the directors of Securities agreed to waive the Securities' rights to subscribe to the issue of 1959. Obviously, as a result of this transaction, the percentage ownership of Securities in Casualty was further diluted.

Finally, in 1962, another public offering of Casualty stock was made. It is this offering with which the plaintiff complains. The 1962 offering paralleled the offerings of 1954 and 1959 except that Securities waived a portion of its rights to subscribe to the new stock of Casualty in order to change the subscription ratio of stockholders other than Securities from 1 for 4⅓ shares to 1 for 4 shares. This was done to avoid the issuance of a large number of fractional shares, the cost of which would have outweighed the value of Securities' rights thus waived.

The Securities directors then agreed to sell to Kidder, Peabody the remaining rights of Securities to subscribe to the new stock of Casualty at a figure which later turned out to be the maximum price developed for the sale of such rights. The reasons why the directors

of Securities concluded that it could not exercise its rights and should not pass its rights on to its own stockholders were similar to those which had governed the prior public offerings of Casualty stock.

With respect to all of the public offerings of Casualty stock, Securities was not financially able to exercise its rights. In all of the public offerings the underwriter regarded it as necessary that the rights of Securities be neutralized in order to insure the success of the underwriting. As a result, all three of the public offerings were successful. Casualty stockholders increased from approximately 150 to over 1900. The results of the underwritings were more favorable to Casualty than would otherwise have been. Casualty stock became a desirable investment and is established in the over-the-counter market.

One result of the three public offerings of Casualty stock with the subsequent waiver or disposal by Securities of its rights to subscribe has been to reduce the percentage ownership of Securities in Casualty to slightly over 41%. This still represents control of Casualty.

In this action plaintiff seeks two remedies. She seeks an accounting from the individual defendants for loss and damages caused Securities by reason of their acts in connection with the underwriting which are characterized as having been designed for the benefit of Casualty and the Duboc-Gordon families rather than for the benefit of all stockholders of Securities. She also seeks the appointment of a receiver for the purpose of either liquidating Securities, merging it with Casualty or reorganizing it so that its stockholders may receive and hold directly the shares of Casualty.

Fundamentally, the basis of the plaintiff's complaint is that Securities is a personal holding company, a fact of which she had no knowledge at the time of purchase of her shares, and apparently has only recently learned that fact. This status prevents Securities from accumulating earnings, borrowing money, etc., so as to take advantage of a corporate opportunity to increase its stock ownership in Casualty, or in fact in any other business enterprise.

We think, however, that the fact that Securities is a personal holding company and, as such, is subject to severe tax consequences does not make its status as such illegal. The continuance of

Securities as a personal holding company by reason of inertia, or by reason of any other motive the majority stockholders may have, does not constitute an illegal act sufficient to justify the appointment of a receiver for the liquidation or reorganization of Securities. We know of no requirement of Delaware law which requires the liquidation of a corporation faced with heavy tax consequences from the application of the regulatory provision of a federal statute. We are referred to no pertinent precedent and, indeed, we doubt if there is any since it is possible that Securities is *sui generis* as a public personal holding company. In any event, it seems that the mere threat of loss by reason of federal regulation is not sufficient to find that permanent irreparable damage will result so as to justify the appointment of a receiver to liquidate. *United Gas Corp. v. Pennzoil Company,* 248 *F. Supp.* 449, *aff'd 2 Cir.,* 354 *F.2d* 1002; and see *Manacher v. Reynolds,* 39 *Del.Ch.* 401, 165 *A.2d* 741, to the effect that holding corporations are not, of themselves, illegal and may oftentimes serve a proper corporate purpose.

It is plain, we think, that for a court to order a dissolution or liquidation of a solvent corporation, the proponents must show a failure of corporate purpose, a fraudulent disregard of the minority's rights, or some other fact which indicates an imminent danger of great loss resulting from fraudulent or absolute mismanagement. *Berwald v. Mission Development Co.,* 40 *Del.Ch.* 509, 185 *A.2d* 480, and *Graham-Newman Corp. v. Franklin County Distilling Co.,* 26 *Del.Ch.* 233, 27 *A.2d* 142. As we pointed out in *Hall v. John S. Isaacs & Sons, Farms, Inc.,* 39 *Del.Ch.* 244, 163 *A.2d* 288, the remedy of a minority stockholder in a corporation who is dissatisfied with its management or method of operation is to withdraw from the corporate enterprise by the sale of his stock when the minority stockholder's complaint is not based on any illegality.

In this action the plaintiff has at most shown that Securities' status as a personal holding company prevents it from taking advantage of opportunities that come its way. This is unfortunate but it is not illegal. The directors have done nothing that the facts of corporate life for Securities have not required them to do. The majority stockholders have the right in their wisdom or folly to continue Securities in its present form, and no court can compel them to alter a perfectly legal corporate form.

There has been, therefore, no showing of imminent loss to Securities flowing from fraudulent or illegal action on the part of the majority stockholders or the directors. Such being the case, a receiver may not be appointed to liquidate Securities.

The plaintiff also seeks an accounting from the individual defendants, some of whom at least are officers and directors of both Securities and Casualty.

■ Individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations. This duty is to be exercised in the light of what is best for both corporations. *Abelow, et al. v. Midstates Oil Corp., Del.,* 189 *A.2d* 675.

With respect, therefore, to Securities and Casualty, the directors who operated in a dual capacity owed Casualty the duty to see that the issuance of its stock should be upon terms best for Casualty. Similarly, the directors of Securities were charged with the duty of determining what was best for Securities, and, in particular, how best to preserve its sole asset—its investment in Casualty.

On the record before us, we think that these directors acted with this standard in mind. It was obviously to the best interest of Casualty to issue its new stock to the public so as to make its stock ownership more widespread and that such stock issue be at the minimum cost to Casualty. As we read this record, there can be no argument but that the issues of new Casualty stock were obtained upon terms beneficial to Casualty and, in fact, accomplished the purpose for which they were made.

The directors of Securities were charged with the fundamental duty of conserving the assets of Securities for the benefit of Securities' stockholders. Since the only real asset of Securities consisted of its ownership of the stock of Casualty, it follows that their judgment should have been exercised in the light of this fact and, we think, necessarily should have been dictated by the decision of what is best for Casualty, the prime asset of Securities.

■ We think, therefore, that it cannot reasonably be said that it was a mistake of judgment to decide to waive or forego the exercise of Securities' rights to subscribe to Casualty stock since that forbearance materially benefited Securities' sole asset.

Plaintiff argues, however, that the directors of Securities were remiss in not passing on to Securities' stockholders the right to subscribe directly to the Casualty shares. There is in the record in opposition to this contention some evidence to the effect that this, of itself, would have defeated one of the prime purposes of the Casualty issue, and have materially increased the cost. Whether or not this be so, we think that the decision as to what Securities should do with its rights to subscribe to Casualty stock was a matter to be decided in accordance with the sound business judgment of the directors of Securities.

We think their decision was made in accordance with sound business judgment. Obviously, Securities could not take up the Casualty rights, itself. As to whether or not the rights should have been passed on to Securities' stockholders, the decision of the directors not to do so was based upon the advice that to do so would have increased the expense and destroyed one purpose of the new issue, *i. e.,* the broadening of the public ownership of Casualty.

While the plaintiff argues that the Securities' directors gave away an asset of Securities, *i. e.,* the rights, we think is not to be the fact for the record is plain that Securities sold its rights to Kidder, Peabody at the top market price established for the rights.

■■ The plaintiff argues that the burden is placed upon the directors in the circumstances of this case to prove that they acted in good faith and to demonstrate the intrinsic fairness of the transaction. We think, however, that this case in no way differs in principle from ordinary one in which the minority charge the majority with a disregard of the minority's interest. In the absence of a showing of bad faith on the part of the directors or of a gross abuse of discretion the business judgment of the directors will not be interfered with by the courts. *Moskowitz v. Bantrell,* 41 *Del.Ch.* 177, 178, 190 *A.2d* 749. The burden of showing the existence of bad faith or abuse of discretion rests upon the plaintiff who charges that the corporate action was taken to benefit the majority at the expense of the minority. *Bennett v. Breuil Petroleum Corp.,* 34 *Del.Ch.* 6, 99 *A.2d* 236; *Marks v. Wolfson,* 41 *Del.Ch.* 115, 188 *A.2d* 680. The acts of directors are presumptively acts taken in good faith and inspired for the best interests of the corporation, and a minority stockholder who challenges

158

their *bona fides* of purpose has the burden of proof. *Porges v. Vadsco Sales Corp.*, 27 *Del.Ch.* 127 32 *A.2d* 148.

Furthermore, the consequences of the corporate actions under attack here are visited equally upon the minority stockholders of Securities and the 55% majority Duboc-Gordon group. If the stock of plaintiff has suffered loss, then by the same token the Duboc-Gordon stock has suffered loss. This being so, common sense would seem to indicate that there was no intent on the part of the majority to injure its own investment.

There has been no real showing that the directors acted for any reason other than the best interests of Securities and its sole asset, Casualty. The plaintiff suggests that the salaries paid them by Casualty were their real motive, and that they had no real interest in the welfare of Securities. The point, however, is little more than a suggestion and is not developed. We think the mere statement of fact of salary payments by Casualty to some of the Securities directors does not, in itself, overcome the presumption of good faith accorded to the acts of directors.

The plaintiff's case in all of its ramifications fundamentally returns to the starting point that the retention of the personal holding company status of Securities is in some fashion an invasion of the minority stockholders' rights by the majority. As we have pointed out, however, this conclusion does not follow. To maintain Securities as a personal holding company may be financially unwise, but it is not illegal.

The plaintiff makes other points which we will note briefly.

She challenges the position of the defendants to the effect that the sole purpose for the existence of Securities has always been to hold control of Casualty. She points to Securities' certificate of incorporation which contains no reference to Casualty and states the nature of Securities' business to be a loan and investment business. Despite this, however, historically Securities has had no business except owning the controlling stock of Casualty.

She argues that while the minority and majority stockholders are treated equally, they both have suffered losses needlessly so as to

perpetuate the Duboc-Gordon control of Casualty. She points out that if Securities were dissolved and the Casualty shares distributed to the Securities' stockholders, the Duboc-Gordon group would own 23% of the Casualty stock which is sufficient for working control.

This may be the fact, but what, we ask, may a court do about it? There is nothing illegal in the continuance of Securities in its present form, and there has been no showing by the plaintiff sufficient to force a liquidation of Securities, which is what the suggestions amount to.

She also argues that summary judgment should not have been entered because there were disputed issues of material fact which the Chancellor improperly resolved. She charges that the defendants obtained new capital for Casualty in a manner which was highly detrimental to Securities' interests; that Securities was caused to participate in a self-destructive scheme which diluted its interest in Casualty; and that the defendant never considered the possibility of other methods of refinancing Casualty.

We think, however, that the facts material to a disposition of this lawsuit are not in dispute. Basically, she claims an issue of material fact to exist as to whether or not alternative schemes of financing should have been considered. This, however, is a matter to be decided by the directors in the light of their business judgment. As we have pointed out, the matter was so decided. There is no issue of fact involved.

In summary, we think it a fair estimate of plaintiff's case to state that it rests entirely upon the proposition that there is something inherently wrong in permitting Securities to retain its personal holding company status to the financial loss of its stockholders. As we have pointed out, there is nothing the courts can do about this, admitting the financial undesirability of its continuance. Since this is the fundamental fact of plaintiff's lawsuit, and since there is no factual dispute at all concerning it, the case, we think, was properly decided on summary judgment.

The judgment below is affirmed.