# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>IN RE TILRAY, INC.<br>REORGANIZATION LITIGATION</td><td>Consolidated<br>C.A. No. 2020-0137-KSJM</td></tr>
</table>

## MEMORANDUM OPINION

Date Submitted: February 5, 2021
Date Decided: June 1, 2021

Peter B. Andrews, Craig J. Springer, Jessica Zeldin, David M. Sborz, ANDREWS & SPRINGER LLC, Wilmington, DE; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, DE; Jeffrey M. Gorris, Christopher M. Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, DE; Jeremy S. Friedman, David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, NY; Mark Lebovitch, David Wales, Andrew Blumberg, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, New York, NY; D. Seamus Kaskela, KASKELA LAW LLC, Newtown Square, PA; *Counsel for Plaintiffs.*

Michael A. Pittenger, Matthew F. Davis, David A. Seal, Caneel Radinson-Blasucci, POTTER ANDERSON & CORROON LLP, Wilmington, DE; *Counsel for Nominal Defendant Tilray, Inc.*

Michael P. Kelly, Daniel M. Silver, Sarah E. Delia, MCCARTER & ENGLISH, LLP, Wilmington, DE; *Counsel for Defendants Brendan Kennedy and Privateer Evolution, LLC.*

Carl N. Kunz, III, K. Tyler O'Connell, Albert J. Carroll, MORRIS JAMES LLP, Wilmington, DE; Ronald L. Berenstain, Sean C. Knowles, PERKINS COIE LLP, Seattle, WA; *Counsel for Defendants Christian Groh and Michael Blue.*

Susan W. Waesco, John P. DiTomo, Daniel T. Menken, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; *Counsel for Defendant Maryscott Greenwood.*

Blake Rohrbacher, Matthew W. Murphy, Elizabeth A. Heise, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; *Counsel for Defendant Michael Auerbach.*

**McCORMICK, C.**

Bucking the advice of *Keep Your Day Job*, to "keep [your day job] on ice while you're lining up your long shot,"[1] three friends quit their jobs nearly a decade ago to capitalize on the expansion of the legal cannabis industry. They created Privateer Holdings, Inc. ("Privateer") to facilitate their investments. Through Privateer, they formed Tilray, Inc. ("Tilray" or the "Company"), a cannabis research, cultivation, processing, and distribution company.

The long shot paid off, and the founders successfully took Tilray public in July 2018, which caused the value of Privateer's investment to skyrocket. This, in turn, prompted the founders to explore ways to reorganize the business to avoid federal tax consequences resulting from capital gains. The founders settled on a downstream merger in which the Company cancelled Privateer's Tilray stock and then issued Tilray stock to Privateer's stockholders.

The plaintiffs are Tilray stockholders. They claim that Privateer and the founders controlled Tilray and used that control to obtain tax benefits through the reorganization without adequately compensating the Company and its minority stockholders. They assert derivative claims against Privateer, the founders, and certain Tilray directors. To meet the demand requirement, they contend that the majority of Tilray's board of directors were interested in or lacked independence as to the challenged reorganization, such that demand was excused as futile.

---

[1] R. Hunter, J. Garcia, *Keep Your Day Job* (1982).

The defendants moved to dismiss the complaint pursuant to Court of Chancery Rule 12(b)(6), arguing that the complaint fails to adequately allege that the founders comprised a control group or that the reorganization was a self-dealing transaction subject to the entire fairness standard. They have also moved to dismiss the complaint pursuant to Court of Chancery Rule 23.1, arguing that the complaint fails to allege with particularity that pre-suit demand should be excused as futile. This decision denies both motions, holding that the complaint adequately alleges the existence of a control group, that the reorganization was a conflicted transaction, and that demand is excused.

This decision also denies a motion to dismiss for lack of personal jurisdiction raised by two of the founders. Because it is reasonably conceivable that the founders were members of a control group with concomitant fiduciary obligations, the plaintiffs allege a *prima facie* basis for exercising personal jurisdiction under the conspiracy theory.

## I. FACTUAL BACKGROUND

The facts are drawn from the First Amended Consolidated Verified Stockholder Class Action and Derivative Complaint (the "Amended Complaint")[2] and documents it incorporates by reference, including public filings and documents obtained in response to the plaintiffs' 8 *Del. C.* § 220 demands.

### A. Kennedy, Groh, and Blue Form Privateer and Its Subsidiary, Tilray.

While working as an investment banker in 2010, Defendant Brendan Kennedy came to believe that the legalization of marijuana in the U.S. was inevitable and "realized that he

---

[2] *See* C.A. No. 2020-0137-KSJM, Docket ("Dkt.") 73 ("Am. Compl.").

could make more money selling pot than as a banker."[3]  He voiced his hopes to a friend and coworker, Defendant Christian Groh, and the two decided to quit their investment banking jobs to pursue this goal.  Kennedy also brought the idea to his former business school classmate, Defendant Michael Blue.  In December 2010, Kennedy, Groh, and Blue (the "Founders") created Privateer, a private equity firm focused on investments in the cannabis industry.

The Founders held over 70% of Privateer's voting power, with Kennedy, Groh, and Blue holding 41%, 16%, and 16% respectively.  Kennedy was Privateer's CEO and later became the Executive Chair of Privateer's Board of Directors.

Through Privateer, the Founders first pooled their assets and raised capital to acquire Leafly Holdings, Inc. ("Leafly"), a marijuana dispensary review site that published ratings on cannabis types (think "Yelp" for cannabis strains).[4]

Privateer's acquisition of Leafly put it on the Canadian government's radar—in a good way.  At the time, the Canadian government was in the process of professionalizing a medical marijuana processing industry and it approached the Founders with investment opportunities.  Rather than invest in others' processing operations, the Founders again

---

[3] *Id*. ¶ 44 (quoting Chris Kornelis, *A CEO Tries to Navigate the Legal Cannabis Sector's Bad Trip*, Wall St. J. (Mar. 6, 2020, 1:08 P.M.), https://www.wsj.com/articles/a-ceo-tries-to-navigate-the-legal-cannabis-sectors-bad-trip-11583518019).

[4] *See* Jen Wieczner, *The Marijuana Billionaire Who Doesn't Smoke Weed*, Fortune (Jan. 16, 2019, 6:30 A.M.), https://fortune.com/longform/marijuana-weed-cannabis-tilray-stock/.

decided to start their own. They formed Tilray in 2013 as a subsidiary of Privateer to conduct cannabis research, cultivation, processing, and distribution, primarily in Canada.[5]

To grow cannabis, the Founders needed seeds. Using the Leafly data, the founders identified desirable cannabis strains in Canada. Acquiring the seeds posed unique risks. As Kennedy once described to Fortune magazine, the Founders "would go and meet people at" a chain coffee shop, "follow them down a road," "[t]hen . . . ditch a car" and enter "rooms with a lot of cash and weapons," where "a lot of people suspected that [the Founders] were federal narcotics agents."[6]

### B.      The Founders Take Tilray Public.

Privateer's initial investment in Tilray was approximately $31.7 million. At first, the Founders struggled to obtain additional funding given public perception of the cannabis industry and the uncertain future of its legality in the U.S. By mid-2018, however, Tilray was on its way to becoming the first cannabis company to complete a public offering on an American stock exchange.

On July 19, 2018, Privateer took Tilray public through an initial public offering (the "IPO") at $17 per share. At the time, Privateer held 75 million shares of Tilray stock. Based on their initial investment of $31.7 million, Privateer's Tilray holdings were valued at approximately $0.42 per share. Tilray's IPO valuation of $17 per share brought the

---

[5] The Founders initially incorporated as Tilray Canada, Ltd., a predecessor to Tilray. *See* Am. Compl. ¶ 48.

[6] *Id*. ¶ 47 (quoting Wieczner, *supra* note 4).

value of Privateer's 75 million shares up to $1.275 billion.  Privateer had realized a gain of approximately forty times its initial investment.

At the time of the IPO, Tilray had two classes of stock issued and outstanding: Class 1 common stock, entitling its holders to ten votes per share, and Class 2 common stock, entitling its holders to one vote per share.  Through the IPO, Tilray offered 9 million shares of Class 2 common stock to the public.  Privateer's pre-IPO Tilray shares converted into approximately 16.67 million shares of Class 1 common stock and 58.3 million shares of Class 2 common stock.  Post-IPO, Privateer held a 75% economic interest in Tilray and controlled over 90% of Tilray's voting power.

### C.    The Founders Propose a Reorganization of Tilray and Privateer.

The IPO made Privateer's stockholders "Tillionaires."[7]  Yet the Founders were unable to access this wealth without incurring significant tax liabilities.  And Privateer's controlling stake in Tilray resulted in an overhang effect exerting downward pressure on the trading price of Tilray's stock.

Although the Founders desired liquidity, they feared that selling large blocks of Privateer's holdings would cause Tilray's stock to plummet.  To temporarily eliminate that threat in connection with the IPO, Privateer executed a lock-up agreement in which it agreed not to sell its Tilray stock for 180 days.  That period was set to expire on January 15, 2019.

---

[7] *See* Wieczner, *supra* note 4.

In early January 2019, the Founders explored different ways to obtain greater liquidity and eliminate the overhang of Privateer's control stake while avoiding the potential tax consequences associated with dissolving Privateer. Privateer sought advice from its tax advisor Andersen Tax ("Andersen"). The Founders considered a spin-off of Tilray but determined that it would result in significant tax exposure in excess of $2 billion.

As an alternative, Andersen recommended a two-step reorganization, which this decision refers to as the "Reorganization." The first step involved a spin-off of Privateer's portfolio companies. At the time, Privateer owned four portfolio companies: Leafly, Tilray, Docklight Brands, Inc. ("Docklight"), and Left Coast Ventures, Inc. ("LCV"). Andersen recommended that Privateer spin-off the three non-Tilray portfolio companies, leaving Tilray stock as Privateer's only asset.

The second step involved a downstream merger, in which the Company would cancel Privateer's Tilray stock and issue Tilray stock to Privateer's stockholders. Under this approach, the IRS would treat the share cancellation and subsequent stock issuance as a tax-free reorganization, allowing the Founders to avoid the tax consequences of a sale or distribution of its Tilray stock while maintaining control over the Company.

Privateer proposed the Reorganization to Tilray in a January 9, 2019 non-binding letter of intent.

On January 11, 2019, Privateer announced that it did not intend to sell its Tilray shares during the first half of 2019 but left open the possibility that Privateer would begin sales after that time.

After multiple discussions with Tilray regarding the Reorganization, Privateer sent a revised draft of the letter of intent to Tilray on January 14, 2019 (the "Draft Letter of Intent").

The Draft Letter of Intent "outline[d] the preliminary understanding" between Privateer and Tilray regarding Privateer's 75 million shares of Tilray Class 1 stock.[8] It further identified benefits of the Reorganization to Tilray, including an extended lock-up agreement preventing Privateer from unloading Tilray stock in the public market.

### D. Tilray Forms a Special Committee.

The Tilray Board of Directors (the "Board") met on January 19, 2019, to discuss the Draft Letter of Intent. At the time, the five-person Board comprised Kennedy, Defendants Michael Auerbach and Maryscott Greenwood (with Auerbach and Kennedy, the "Director Defendants"), and non-parties Rebekah Dopp and Christine St. Clare.

During the January 19 meeting, the Board discussed forming a special committee and hiring advisors. The independent directors of the Board decided at the meeting to hire Paul Hastings LLP as their legal advisor and executed the engagement letter on January 30, 2019.[9]

The Chair of Paul Hastings' New York office, Barry Brooks, had previously represented Tilray in connection with various joint ventures and had previously represented Kennedy in connection with his employment agreement. Brooks was also a Privateer

---

[8] Am. Compl. ¶ 85 (alteration in original).

[9] Prior to its retention by Tilray, Paul Hastings had engaged in conversations with Cooley LLP, the Founders' outside counsel. *Id.* ¶ 94.

7

stockholder. Due to these connections, Paul Hastings walled-off Brooks from the engagement. Luke Iovine, another partner in Paul Hasting's New York office, would instead serve as Tilray's counsel.

Although Tilray had not yet formed a special committee by February 14, 2019, the Founders commenced the first step of the Reorganization. That day, Privateer spun off Leafly, Docklight, and LCV by making in-kind taxable distributions to its stockholders, completing the first step in the Reorganization. The Founders agreed that Groh and Blue would take the lead managing these entities, while Kennedy would continue to take the lead managing Tilray.

The next day, the Board created a special committee to address conflicts arising from Board members with ties to Privateer (the "Special Committee"). Privateer and Tilray recognized the presence of a controller on both sides of the Reorganization and the resulting conflict it presented. One copy of the Draft Letter of Intent referenced in the Amended Complaint bears a note—with no author attributed—stating that the "biggest concern relates to board independence" and expressing the need to "ensure the board comes to the conclusion that this is in the best interest of Tilray on its own."[10] Auerbach held Privateer stock and served on the Privateer board of directors, and so he was excluded from the committee along with Kennedy.

---

[10] *Id.* ¶ 90.

The Board selected Greenwood, Dopp, and St. Clare to serve on the Special Committee and named Greenwood as its Chair. Dopp and St. Clare were indisputably independent with respect to the Founders, Privateer, and the Reorganization.

Greenwood had long-standing ties to Kennedy and Privateer. Greenwood is a cannabis lobbyist and has long-standing business relationships with Kennedy, Privateer, and Tilray. As the executive and eventual CEO of the Canadian American Business Council (the "CABC"), Greenwood advocated to deregulate cannabis on behalf of Privateer, hosted Kennedy as a guest of honor at the CABC annual dinner, and introduced Kennedy to U.S. state legislators at a national event. Greenwood worked for the Founders as a lobbyist since 2015. Greenwood was head of Dentons' U.S. Public Policy practice in late 2015, when Privateer hired Dentons to lobby on its behalf regarding the federal regulation of cannabis for medical use. That engagement continued until 2017. Kennedy recruited her to join the Tilray Board in 2018.

The Special Committee met to select financial and tax advisors on March 6, 2019.[11] During that meeting, it selected Imperial Capital, LLC ("Imperial") as its financial advisor and Crowe LLP as its tax advisor. It did not formally retain Imperial and Crowe until March 27 and June 21, 2019, respectively.

---

[11] *See id*. ¶ 101. The Amended Complaint states that this meeting occurred on March 6, 2020. *Id.* Given the timing of the Reorganization and the contextual chronology of the narrative in the Amended Complaint, this decision assumes that the year "2020" was a typo and infers that the date of this Special Committee meeting was March 6, 2019.

9

### E. The Letter of Intent

The Special Committee and Privateer negotiated toward a final letter of intent through the first half of 2019. The Special Committee, however, did not prepare minutes of these meetings, such that it is unclear what the Special Committee did and when.

There was a flurry of Special Committee activity in March 2019. Meetings took place on March 1 and March 12, though no records are available detailing the participants of or the topics covered by those conversations. Representatives from Privateer gave a presentation to Tilray's Board on March 13, 2019, but there are no minutes of that meeting. The following day, the Board met to discuss Privateer's Draft Letter of Intent. Paul Hastings did not attend the meeting.

Also during that March 14 meeting, the Board discussed and approved a services agreement with Ten Eleven Management LLC ("Ten Eleven"), a company Groh and Blue formed to provide administrative and corporate consulting services to Tilray for $25,000 per month.

The Special Committee met with Paul Hastings on March 28, 2019, to discuss its advisors' fees and was then inactive until at least late May 2019. On May 20, 2019, Tilray, Privateer, and their respective outside counsel, Paul Hastings and Cooley, met to discuss the structure of the downstream merger. The Special Committee members did not attend, and there are no minutes of the meeting.

On May 21, 2019, Kennedy and Greenwood met without advisors or the other Special Committee members to discuss the status of negotiations. There are no minutes or other corporate documents reflecting discussions at that meeting.

10

On June 2, 2019, Kennedy again met with Greenwood to discuss the transaction and its terms, this time with counsel for Tilray and Privateer present.

Around this time, lobbyist group Crestview Strategy ("Crestview") hired Greenwood as a Managing Director to lead its U.S. practice. The Amended Complaint alleges that Crestview was Greenwood's primary source of income and Tilray and Privateer were two of Crestview's most important clients. Ten of Crestview's forty-one employees have lobbied on behalf of Tilray at some point since 2016, and five Crestview employees have done work for Privateer. Crestview has highlighted its relationship with Tilray in multiple social media posts, and news articles have publicly identified Tilray as one of Crestview's clients.

In June 2019, the Special Committee demanded that the Reorganization be conditioned on approval by a majority of Tilray's minority stockholders. Paul Hastings conveyed this demand in a June 5, 2019 redline to the Draft Letter of Intent by adding a requirement that a majority-of-the-minority of Tilray's stockholders consent to the Reorganization. That day, Privateer rejected the majority-of-the-minority requirement. None of the minutes of the Special Committee meetings reflect any discussions of the majority-of-the-minority approval condition.

Before the Special Committee received a fairness opinion from either of its financial advisors, Greenwood signed a final, non-binding letter of intent on June 8, 2019 (the "Letter of Intent").

The Letter of Intent memorialized three core aspects of the parties' agreement.

- **A downstream merger and stock cancellation**. The parties agreed that Privateer would merge into a wholly-owned subsidiary of Tilray, Privateer's Tilray shares would be cancelled, and Tilray would issue to Privateer stockholders newly registered shares of Tilray common stock in an aggregate amount equal to the number of Tilray common shares held by Privateer. Tilray would allocate the newly issued shares to Privateer stockholders in accordance with the Privateer certificate of incorporation in effect prior to closing.

- **Charter amendments intended to remove exceptions to the transfer restrictions and facilitate the elimination of "high vote" Class 1 stock.** The parties agreed that Tilray's certificate of incorporation would be amended to remove a provision favorable to the Founders, which allowed them to transfer their Class 1 stock to one another without triggering automatic conversion to Class 2 stock. This decision refers to the original exemption as the "transfer restriction exemptions" and the charter amendments to eliminate them as the "transfer restriction exemption amendments."

- **A new lock-up agreement**. The parties agreed that shares of Tilray stock distributed to Privateer stockholders in the Reorganization would be subject to a lock-up allowing for the sale of such shares only under certain circumstances over a two-year period. Privateer also agreed to a lock-up of its Tilray shares during the negotiating period for the definitive merger agreement.

Tilray publicly announced the Letter of Intent on June 10, 2019. Kennedy posted a tweet that day touting the tax-efficient nature of the Reorganization and the accompanying lock-up agreement that would "provide for an orderly release of Privateer's stake in Tilray."[12]

---

[12] *Id*. ¶ 121 (quoting Brendan Kennedy (@BrendanTKennedy), Twitter (Jun. 10, 2019, 10:22 A.M.), https://twitter.com/BrendanTKennedy/status/1138089006619451397).

### F. The Merger Agreement

Cooley sent Paul Hastings an initial draft of the merger agreement on June 17, 2019, and the parties and their advisors met around this time to discuss the draft and the timing of the transaction. The parties exchanged nearly twenty drafts of the merger agreement before the Special Committee approved it on September 9, 2019.

During negotiations, Privateer requested a termination right relating to action by Privateer stockholders. As discussed above, Tilray intended to allocate the newly issued shares to Privateer stockholders in accordance with the Privateer certificate of incorporation in effect prior to closing. Privateer's certificate of incorporation prior to closing, however, involved a dual-class structure that granted the Founders voting control over Privateer but required that distributions be made based on economic interests rather than voting rights. To extend the Founders' collective voting control over Tilray, the Founders proposed an amendment to Privateer's certificate of incorporation that would allocate Tilray's Class 1 stock only to the Founders instead of *pari passu* to all Privateer investors. If Privateer's stockholders did not approve the Privateer charter amendment, the Founders wanted to be able to terminate the agreement.

The Special Committee agreed to include such a termination right if Privateer agreed to a six-month lock-up following the occurrence of such termination.

The Special Committee also demanded an escrow arrangement through which Privateer would indemnify Tilray for any liability resulting from the Reorganization. The escrow would contain some of the Tilray stock that otherwise would have been distributed to Privateer stockholders in the Reorganization. Paul Hastings, on behalf of the Special

13

Committee, proposed an escrow fund comprising both Class 1 stock and Class 2 stock. According to Paul Hastings, Tilray would not "approve the transaction if the escrow arrangements would inadvertently or intentionally increase the voting power" of the Founders by holding only Class 2 stock in escrow while distributing the high vote Class 1 stock to the Founders.[13]

When Paul Hastings proposed the six-month lock-up condition and escrow arrangement, Kennedy threatened to terminate negotiations. In a July 12 email to Greenwood, Kennedy stated that Groh and Blue "won't budge" and were "planning to send a notice of termination on Monday and sell/dividend the first batch of shares as soon as Friday."[14] He noted his disappointment with that outcome, which he viewed as "a bad result for Tilray and for [himself]."[15]

Negotiations continued, and the Special Committee secured a four-and-a-half-month lock-up condition and an expense reimbursement of up to $3 million in the event of termination. The Special Committee also approved of an escrow fund comprising only Class 2 stock.

Kennedy called a Board meeting on July 26, 2019, to discuss the Reorganization, though Paul Hastings representatives did not attend and there are no minutes of the meeting. On July 27, the Special Committee received its first oral fairness opinion from Imperial. The Special Committee approved the Merger Agreement that day.

---

[13] *Id.* ¶ 129.

[14] Dkt. 88 ("Seal Decl.") Ex. 11 at 1.

[15] *Id.*

In the weeks following the Special Committee's approval, the Founders communicated some additional demands to the Special Committee through the Company's CFO. Specifically, Privateer wanted Tilray to conduct an "at the market [public] offering" and use the cash proceeds to finance a portion of the Reorganization.[16] The Special Committee brought Privateer's demand to the Board, which then incorporated the possibility of an "at the market" offering into the Reorganization's terms.[17]

The Board approved and executed the Agreement and Plan of Merger and Reorganization (the "Merger Agreement") at a September 9, 2019 Board meeting.[18] The Merger Agreement incorporates the provisions contemplated in the Letter of Intent and the additional provisions negotiated by the parties.

The minutes from the September 9 Board meeting highlight four primary benefits of the merger to Tilray:

- Elimination of the stock overhang issues;

- The elimination of the transfer restriction exemptions;

- The lock-up agreements; and

- The escrow and indemnification provisions.[19]

---

[16] Am. Compl. ¶¶ 138–39.

[17] *Id.*; *see id.* ¶ 150 ("Tilray may apply cash from an [at the market offering] as consideration for up to 20% of the Privateer holders' Class 2 Stock.").

[18] *Id.* ¶ 143. In the days leading up to the Board's approval, the Special Committee received both a tax diligence presentation from Crowe and a final written fairness opinion from Imperial. *See id.* ¶¶ 140–43.

[19] Seal Decl. Ex. 13 at 1–2 (formatting altered). Reference to the above-quoted "benefits of the [Reorganization] to Tilray" appear verbatim in the minutes from the Special Committee's July 27, 2019 meeting. *Compare id.* with Seal Decl. Ex. 24 at 1–2.

15

Blue signed the Merger Agreement on Privateer's behalf and all three Founders signed agreements (a) assuming Privateer's obligations under a prior agreement with non-party Marley Green, LLC (the "Guarantee Agreement"); (b) restricting their ability to sell their Tilray stock for two years after the Reorganization (the "Lock-Up Agreement"); and (c) promising to vote their respective Privateer shares in favor of the Reorganization (the "Support Agreement").[20]

On November 12, 2019, Tilray filed a Form S-4 disclosing the terms of the Merger Agreement.[21] The S-4 noticed a special meeting of Tilray stockholders to be held on December 6, 2019, to vote on the Merger Agreement and the transfer restriction exemption amendment.

Tilray's stockholders approved the Merger Agreement and transfer restriction exemption amendment on December 6, 2019, and the Reorganization closed on December 12, 2019. Privateer merged into Privateer Evolution, LLC, a subsidiary formed by Tilray for the purpose of acquiring Privateer in the Reorganization.

---

[20] Am. Compl. ¶ 154; *see also* Seal Decl. Ex. 14 (attaching the form of Lock-Up Agreement); Dkt. 108 ("Zeldin Decl.") Ex. 5 (attaching the form of Support Agreement).

[21] Seal Decl. Ex. 1 (Tilray Nov. 11, 2019 Form S-4). Plaintiffs contend that the Form S-4 failed to include the prior relationships and engagements that they argue rendered Greenwood and Paul Hastings conflicted, as well as information regarding Imperial's fairness opinion, which Plaintiffs contend failed to properly analyze the "give" and "get" for Tilray in the Reorganization. *See* Am. Compl. ¶¶ 155–57.

### G.    This Litigation

Plaintiffs each own shares of Tilray Class 2 stock.[22]  Each filed claims challenging the Reorganization.  The court consolidated the actions on March 20, 2020, and Plaintiffs filed their Amended Complaint on July 17, 2020, asserting two Counts.

In Count I, Plaintiffs assert a direct claim against Privateer and the Founders for breaching their fiduciary duties as controllers.[23]  Plaintiffs claim that the Founders, working as a control group with Privateer, breached their fiduciary duties in two ways.

First, Plaintiffs claim that the Founders used the Reorganization to perpetuate their control over Tilray.  This decision refers to this theory as the "control-based theory."

Second, Plaintiffs claim that the Founders used the Reorganization to extract non-ratable tax benefits from Tilray and its minority stockholders.

In Count II, Plaintiffs assert a derivative claim that Kennedy, Auerbach, and Greenwood breached their fiduciary duties as directors.[24]

Privateer and the Founders moved to dismiss Count I pursuant to Court of Chancery Rule 12(b)(6).  Tilray and the Director Defendants moved to dismiss Count II pursuant to Court of Chancery Rule 23.1, arguing that demand was not made and is not excused as

---

[22] The plaintiffs are Deborah R. Braun, Nader Noorian, Catherine Bouvier, James Hawkins, and Stephanie Hawkins (collectively, "Plaintiffs").  Plaintiffs Braun and Noorian filed a complaint on February 27, 2020.  Plaintiffs Catherine Bouvier, James Hawkins, and Stephanie Hawkins filed a similar action on March 2, 2020.  *See* C.A. No. 2020-0154-KSJM, Dkt. 1.

[23] *See* Am. Compl. ¶¶ 187–92.

[24] *See id*. ¶¶ 193–99.

17

futile.[25] Groh and Blue separately moved to dismiss themselves as defendants pursuant to Court of Chancery Rules 12(b)(2) and 12(b)(5) for lack of personal jurisdiction and insufficient service of process.[26] The parties fully briefed the motions and the court heard oral argument on February 5, 2021.[27]

### H. Dual Class Elimination

Tilray's amended charter contains another new provision for automatic conversion of all Tilray's Class 1 stock into Class 2 stock at

> 5:00 p.m . . . on the first Trading Day falling after the date on which, at all times on such date, the outstanding shares of Class 1 [stock] represent less than ten percent (10%) of the aggregate number of shares of the then outstanding Class 1 [stock] and Class 2 [stock].[28]

Neither the Plaintiffs nor Tilray's November 11, 2019 Form S-4 discuss the automatic conversion provision, and it is unclear when it was negotiated. This amendment provided an otherwise nonexistent runway for the eventual and automatic elimination of Tilray's Class 1 stock.

---

[25] Dkt. 77; *see* Dkt. 88 ("Tilray Opening Br."). Defendants have all joined in this motion. *See* Dkts. 79–82 (joining in Tilray's motion to dismiss pursuant to Rule 23.1).

[26] Dkt. 78; *see* Dkt. 89 ("Groh & Blue Opening Br.") at 16–35.

[27] *See* Tilray Opening Br.; Groh & Blue Opening Br.; Dkt. 90 ("Auerbach Opening Br."); Dkt. 92 ("Greenwood Opening Br."); Dkt. 93 ("Kennedy & Privateer Opening Br."); Dkt. 108 ("Pls.' Answering Br."); Dkt. 114 ("Auerbach Reply Br."); Dkt. 115 ("Kennedy & Privateer Reply. Br."); Dkt. 116 ("Groh & Blue Reply Br."); Dkt. 117 ("Greenwood Reply Br."); Dkt. 118 ("Tilray Reply. Br."); Dkt. 137 ("Oral Arg. Tr.").

[28] Zeldin Decl. Ex. 3 Art. IV ¶ D(1)(f); *id.* Art. IV ¶ D(5)(a)(i).

By operation of the automatic conversion provision, on September 30, 2020, Tilray's Class 1 stock converted to Class 2 stock.[29] As a result, the Founders' voting power now equals their economic stake in Tilray.[30]

Plaintiffs premised their control-based theory of Count I on the notion that the Founders sought to perpetuate their control over Tilray's super-voting Class 1 stock after the Reorganization. Plaintiffs concede that the automatic conversion mooted their Count I control-based theory.[31]

## II.    LEGAL ANALYSIS

This analysis first addresses Privateer's and the Founders' motions to dismiss Count I pursuant to Rule 12(b)(6). Next, it addresses the Director Defendants' motion to dismiss Count II pursuant to Rule 23.1. Last, it addresses Groh and Blue's motion to dismiss for lack of personal jurisdiction.

### A.    Motion to Dismiss Count I Pursuant to Rule 12(b)(6)

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[32] When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . ,

---

[29] Dkt. 120 ("Radinson-Blasucci Decl.") Ex. 1 at 2; *see* Zeldin Decl. Ex. 3 Art. IV ¶ D(1)(a)(f); *id.* Art. IV ¶ D(5)(a)(i).

[30] Radinson-Blasucci Decl. Ex. 1 at 2.

[31] *See* Oral Arg. Tr. at 15:20–16:7 (Plaintiffs' Counsel) ("We're not going to contend that any direct claim is before the Court today. They have been mooted. . . . [W]e've only got derivative claims at this point."); *see also* Dkt. 120 ("Defs.' Mootness Br.") (arguing that the elimination of Class 1 stock mooted Plaintiffs' perpetuation-of-control claims).

[32] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[33]   The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[34]

In Count I, Plaintiffs claim that the Founders comprised a control group and that they used their control to unfairly extract unique, non-ratable tax benefits through the Reorganization.  Defendants dispute that the Founders, individually or collectively, were controllers with concomitant fiduciary obligations.   They further dispute that the Reorganization was a self-dealing transaction subject to review under the entire fairness standard.

### 1. Plaintiffs Adequately Allege That the Founders Comprised a Control Group.

Plaintiffs claim that the Founders controlled Tilray indirectly through their control over Privateer.  Defendants do not dispute that Privateer controlled Tilray.[35]  Defendants also do not dispute that *if* the Founders comprised a group, that group controlled Privateer

---

[33] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[34] *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[35] *See* Tilray Opening Br. at 6 (noting that "[b]efore the Reorganization, Privateer held . . . 90% of [Tilray's] voting power"); *see also* Am. Compl. ¶ 54 ("Tilray describes itself as a 'controlled company' in its public filings.").

by virtue of the Founders' collective 73% voting power.[36] Defendants further do not dispute that *if* the Founders controlled Privateer as a group, then the Founders controlled Tilray, and thus owed fiduciary obligations to Tilray and its minority stockholders in connection with the Reorganization.[37] Defendants argue that the Founders did not form a control group.

The Delaware Supreme Court addressed the requirements for pleading a control group in *Sheldon v. Pinto Technology Ventures, L.P.*, adopting the "legally significant connection" standard applied in multiple decisions of this court:

> To demonstrate that a group of stockholders exercises control collectively, the [Plaintiffs] must establish that they are connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. To show a legally significant connection, the [Plaintiffs] must allege that there was more than a mere concurrence of self-interest among certain stockholders. Rather, there must be some indication of an actual agreement, although it need not be formal or written.[38]

---

[36] Before the Reorganization, Kennedy, Blue, and Groh respectively controlled 41%, 16%, and 16% and collectively controlled 73% of Privateer's voting power. *See* Am. Compl. ¶¶ 16–18.

[37] *See* Pls.' Answering Br. at 27–28 (quoting *In re Ezcorp Inc. Consulting Ag. Deriv. Litig.*, 2016 WL 301245, at *9 (Del. Ch. Jan. 25, 2016) for the proposition that "[a]n ultimate human controller who engages directly or indirectly in an interested transaction with a corporation is potentially liable for breach of duty, even if other corporate actors made the formal decision on behalf of the corporation, and even if the controller participated in the transaction through intervening entities")); Kennedy & Privateer Reply Br. (no discussion of *Ezcorp.*); Groh & Blue Reply Br. (no discussion of *Ezcorp.*).

[38] *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251–52 (Del. 2019) (cleaned up) (first quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014) and then quoting *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *10 (Del. Ch. Mar. 26, 2018)); *see also Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697,

In applying this standard, the *Sheldon* court compared the allegations at issue to two cases of this court that sit "on opposite ends of the [control group] spectrum"[39]—*van der Fluit v. Yates*[40] and *In re Hansen Medical, Inc. Stockholders Litigation*.[41]

In *Yates*, the court found that the plaintiff failed to adequately allege facts sufficient to identify a legally significant connection between two venture capital investors and the company's co-founders.[42] There, the plaintiffs relied on two agreements to show the required "legally significant" connection between the investors and the founders.[43] The first was an investors' rights agreement that gave information rights to early-stage investors. That agreement was executed by all investors in the financing round, not only the alleged control group members, and had nothing to do with the challenged transaction.[44] The second was a tender and support agreement executed in connection with the challenged merger. That agreement was executed by some, but not all, of the control group members.[45] The court concluded that the two agreements failed to "evidence the

at *4–5 (Del. Ch. May 22, 2009) (dismissing a complaint where the only allegations of a "legally significant" agreement were unsupported by the facts as pled).

[39] *Sheldon*, 220 A.3d at 250.

[40] 2017 WL 5953514 (Del. Ch. Nov. 30, 2017).

[41] 2018 WL 3025525 (Del. Ch. June 18, 2018).

[42] 2017 WL 5953514, at *7.

[43] *Id.* at *6.

[44] *Id.*

[45] *Id.*

22

presence of a control group rather than a 'concurrence of self-interest among certain stockholders.'"[46]

In *Hansen*, by contrast, the court found that the plaintiffs adequately alleged facts sufficient to infer the existence of a control group among stockholders who agreed to rollover their equity in the challenged merger.[47] The plaintiffs pled "more than mere concurrence of self-interest" by identifying an array of plus factors that allowed the court to infer "some indication of an actual agreement."[48] These factors included both historical ties and transaction-specific ties.

As historical ties, the plaintiffs identified: the group members' twenty-one-year history of investing in the same entities; self-designation as a "group" in historical SEC filings unrelated to Hansen; the group members' exclusive right to participate in the private placement that made them Hansen's largest stockholders; and Hansen's historical designation of the group members as "Principal Purchasers" in subsequent private placements, which gave the group members special rights concerning the private placements.[49]

As transaction-specific ties, the plaintiffs identified: the acquiring company identifying the group members as "Key Stockholders," and allowing the "Key

---

[46] *Id.* (quoting *Crimson*, 2014 WL 5449419, at *15).

[47] 2018 WL 3025525, at *8–9.

[48] *Id.* at *6–7; *see also Sheldon*, 220 A.3d at 252 (describing the analysis in *Hansen* approvingly).

[49] *Hansen*, 2018 WL 3025525, at *7.

Stockholders, but only the Key Stockholders, to negotiate directly with" the acquiring company; the group members entering into contemporaneous voting agreements that required the members to vote in favor of the transaction; and the group members entering into stock purchase agreements requiring that they rollover their stakes in the surviving entity.[50]

In *Sheldon*, the plaintiff argued that the alleged control group members entered into a stockholder agreement that did not relate to the challenged transaction, and some (but not all) of them had a "long and close relationship of investing together for their mutual benefit."[51] The high Court affirmed the trial court's holding that the plaintiffs' control-group allegations were more similar to the allegations in *Yates* than to those in *Hansen* and thus were insufficient to establish a legally significant connection.[52]

In this case, the control-group allegations as to the Founders veer far toward the *Hansen* side of the spectrum and perhaps state a stronger case than the allegations in *Hansen*. Plaintiffs have alleged a concurrence of interests among the Founders—the desire to avoid massive tax liability associated with the substantial increase on Privateer's initial investment in Tilray. This interest is not shared by other Tilray stockholders—it is unique to the Founders. The plaintiffs have also alleged "plus" factors in the form of historically and currently significant ties and transaction-specific ties among the Founders.

---

[50] *Id.*

[51] *Sheldon*, 220 A.3d at 253.

[52] *Id.* at 255.

As historical and current ties, Plaintiffs allege that the Founders are former classmates and long-time friends. They have been friends for a long time. They co-founded Privateer, served together on the Privateer board, and jointly managed Tilray and other Privateer portfolio companies as executives and through management agreements. They jointly engaged in the "follow . . . down a road" and "ditch a car" start-up risks unique to Tilray's business.[53] They held each other out as "partners"[54] and defined themselves in Privateer's charter collectively as the "Founders."[55] Currently, they share an office space and "work on their various co-ventures just down the hall from each other."[56]

As transaction-specific ties, the plaintiffs allege that Tilray's proxy describing the Reorganization adopts the definition of "Founders" and uses it to describe Kennedy, Groh, and Blue's collective influence over Tilray.[57] In connection with the Reorganization, they jointly retained tax advisors through Privateer.[58] Kennedy and Blue led negotiations on behalf of Privateer, referring to themselves as a voting block of Founders and objecting to terms that would diminish their collective voting position.[59] The Founders agreed to

---

[53] *Supra* note 6 and accompanying text.

[54] Am. Compl. ¶ 19.

[55] *Id*. ¶¶ 55–56.

[56] *Id*. ¶ 22.

[57] *Id*. ¶¶ 58–59.

[58] *See id*. ¶ 68.

[59] *Id*. ¶ 129 ("'Privateer was not comfortable with [the proposed escrow arrangement] because the voting power of the founders could . . . be reduced by .2%.' In other words, the Control Group (which was acting, and being treated, as a group) was so fixated on maintaining its control that it had balked at any mechanism that would reduce its collective voting power by .2%." (ellipses in original)); *see also id*. ¶ 134 (alleging that "Blue spoke

distribute Privateer's Class 1 stock only to themselves—and not Privateer's other stockholders—in the Reorganization.[60]  To maintain their control of Tilray through exclusive ownership of its Class 1 stock, the Founders both amended the distribution provision in Privateer's charter and rejected the Special Committee's proposal to withhold some Class 1 stock for the escrow fund.[61]  The Founders reached an understanding that they would divide managerial authority and responsibility over Privateer's various portfolio companies.

These allegations make it reasonably conceivable that the desire to avoid massive tax liabilities through the Reorganization was more than merely a concurrent interest, but rather, a shared goal that the Founders agreed or arranged to work toward.

Groh and Blue argue that Kennedy, standing alone, constituted a controller of Privateer and Tilray, and that there is no basis to infer that Kennedy included Groh and Blue in a control group.  For this point, Groh and Blue rely primarily on two recent decisions of this court—*Almond v. Glenhill Advisors, LLC*[62] and *Gilbert v. Perlman*.[63]

In *Almond*, the plaintiffs alleged that a number of minority stockholder defendants formed a control group with a stockholder that owned 92.8% of the company's outstanding

---

with Tilray's CFO Mark Castaneda regarding certain issues relating to the merger and stockholder lock-up agreement").

[60] *See id*. ¶¶ 80, 120, 153.

[61] *See id*. ¶¶ 129, 151.

[62] 2018 WL 3954733 (Del. Ch. Aug. 17, 2018), *aff'd*, 224 A.3d 200 (Del. 2019) (TABLE)

[63] 2020 WL 2062285 (Del. Ch. Apr. 29, 2020).

stock.[64]  Then-Chancellor Bouchard referred to this as a "glom on" theory, explaining that the plaintiff sought to "glom on to a preexisting controlling stockholder additional stockholders to give them the status of a control group."[65]  In rejecting the theory, the Chancellor explained that, "[g]iven that the controller already is the proverbial 800-pound gorilla imbued with fiduciary obligations to guard against acting selfishly to the detriment of the corporation's minority stockholders, it is not readily apparent why this scenario would arise."[66]

Vice Chancellor Glasscock expressed a similar sentiment in *Gilbert*.[67]  There, Francisco Partners held a 56% ownership stake in the company, but the plaintiff alleged that it was not the sole controller—instead, the plaintiff alleged that Francisco Partners formed a control group with two other defendants that owned approximately 11% and 0.02% of the company.[68]  The court adopted the Chancellor's reasoning in *Almond* and rejected the control group theory because it was not reasonably conceivable that the pre-existing controller "need[ed] to include the minority holders to accomplish the goal, so that it has ceded some material attribute of its control to achieve their assistance."[69]

---

[64] 2018 WL 3954733, at *25.

[65] *Id.* at *26 (internal quotation marks omitted).

[66] *Id.* (internal quotation marks omitted).

[67] *See* 2020 WL 2062285, at *6–10.

[68] *Id.* at *7.

[69] *Id.*

In this case, unlike in *Almond* and *Gilbert*, it is reasonably conceivable that Kennedy needed Groh and Blue to accomplish the Reorganization even if he independently controlled aspects of Privateer or Tilray. Plaintiffs allege that Founders reached an understanding that they would divide managerial authority and responsibility over Privateer's various portfolio companies as part of the Reorganization. It is reasonably conceivable that Kennedy needed his long-time friends and trusted colleagues who had been with Privateer since 2010 to keep the rapidly growing businesses afloat.

"In the end, '[b]ecause the analysis for whether a control group exists is fact intensive, it is particularly difficult to ascertain at the motion to dismiss stage.'"[70] Because the Amended Complaint has pled facts from which it is reasonably conceivable that the Founders had a concurrence of interest as well as historically significant and transaction-specific ties, it is reasonably conceivable that they comprised a control group over Privateer and, through Privateer, Tilray.

### 2. Plaintiffs Adequately Allege That the Reorganization Was a Conflicted Transaction and Is Subject to Entire Fairness Review.

When a plaintiff challenges a transaction involving self-dealing by a controller or control group, the default standard of judicial review is entire fairness with the burden of persuasion on the defendants.[71] Defendants do not argue that the Reorganization employed

---

[70] *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *11 (Del Ch. Dec. 20, 2019) (alteration in original) (quoting *Hanson*, 2018 WL 3025525, at *6).

[71] *Ezcorp*, 2016 WL 301245, at *11 (quoting *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012)).

any procedural protections to restore the business judgment standard. Rather, Defendants seek to avoid entire fairness review by contending that the Reorganization did not involve self-dealing.[72] Defendants rely primarily on a 1971 decision of the Delaware Supreme Court, *Sinclair Oil Corporation v. Levien*.[73]

In *Sinclair*, Sinclair owned 97% of the stock of Sinven.[74] Sinclair needed cash and caused Sinven to issue excessive dividends, ultimately forcing Sinven to dissolve.[75] One of Sinven's minority stockholders challenged the dividend payments as a breach of fiduciary duties by Sinclair and its directors.[76] The trial court analyzed the claims under the entire fairness standard and entered judgment against Sinclair.[77] On appeal, the high Court reversed on the grounds that the challenged dividend payments were subject to the business judgment standard.[78] Although the high Court agreed with the trial court's ruling that the entire fairness standard applies to self-dealing transactions with a controlling stockholder, the court concluded that the dividend payments were not self-dealing transactions.[79]

---

[72] *See* Auerbach Opening Br. at 7–16; Auerbach Reply Br. at 6–11; Groh & Blue Reply Br. at 16–19; Tilray Opening Br. at 61–62.

[73] 280 A.2d 717 (Del. 1971).

[74] *Id.* at 719.

[75] *Id.*

[76] *Id.*

[77] *Id.* at 719–20.

[78] *Id.* at 722.

[79] *Id.*

In reaching this conclusion, the *Sinclair* court described the nature of "self-dealing" transactions as follows:

> A parent does indeed owe a fiduciary duty to its subsidiary when there are parent-subsidiary dealings. However, this alone will not evoke the intrinsic fairness standard. This standard will be applied only when the fiduciary duty is accompanied by self-dealing—the situation when a parent is on both sides of a transaction with its subsidiary. Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary.[80]

The high Court went on to conclude that although the "dividends resulted in great sums of money being transferred from Sinven to Sinclair . . . a proportionate share of this money was received by the minority shareholders," and "Sinclair received nothing from Sinven to the exclusion of its minority stockholders."[81] As such, these dividends were not self-dealing.

Defendants cite *Sinclair* for the proposition that, when a controller causes the controlled corporation to enter into a transaction outside of the squeeze-out merger context, self-dealing sufficient to give rise to entire fairness review requires a benefit "to the exclusion of, and detriment to, the minority stockholders."[82] Defendants reduce this holding to a three-part test, arguing that "self-dealing *requires* three elements: (1) an exclusive benefit to the fiduciary (2) that causes (3) a detriment to the minority

---

[80] *Id.* at 720.

[81] *Id.* at 721–22.

[82] *Id.* at 720.

stockholders."[83]   Defendants concede that the Reorganization conveyed a non-ratable

benefit exclusively to Privateer and the Founders but argue that because the tax benefits

available to Privateer's stockholders in the Reorganization were not extracted *from* and

were never available to Tilray's minority stockholders, the controller caused no detriment

to the minority.[84]

Multiple decisions of this court have impliedly rejected Defendants' argument,

finding that entire fairness presumptively applies *whenever* a controller extracts a non-

ratable or unique benefit.[85]  This rule acknowledges that, absent procedural protections not

invoked here, "an '800-pound gorilla' in the board room . . . has retributive capacities that

---

[83] Auerbach Opening Br. at 7 (emphasis added); *see also* Groh & Blue's Reply Br. at 16 (arguing that "*Sinclair* . . . provides that to state a breach-of-fiduciary duty claim based on alleged self-dealing, any benefit obtained by the parent company (or the parent's alleged controller) must be received 'from the subsidiary'").

[84] *See* Groh & Blue Reply Br. at 17–18; Auerbach Opening Br. at 10; Auerbach Reply Br. at 12–14.

[85] *See Ezcorp*, 2016 WL 301245, at *11–15 (collecting cases standing for the proposition that entire fairness is appropriate when evaluating bilateral transactions "between a controller or its affiliate and the controlled entity" and not just for squeeze-out mergers); *Garfield*, 2019 WL 7168004, at *7–8 (applying the entire fairness standard to claims challenging a corporate reorganization that conferred benefits on a control group not shared by the minority because where "a controlling stockholder . . . extracts personal benefits from [a] transaction . . . the controller's presence is said to exert inherent coercion on both corporate decision-making bodies to which Delaware courts ardently defer—the board of directors and disinterested voting stockholders" (cleaned up)); *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6–9 (Del. Ch. Dec. 11, 2017) (holding that the entire fairness standard presumptively applied to claims challenging a reclassification where, although nominally ratable, the controller stood to gain a unique benefit by perpetuating its control); *In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1206–14 (Del. Ch. 2000) (applying the entire fairness standard to claims challenging a controller's request that its subsidiary waive anti-takeover protections under Section 203 of the Delaware General Corporation Law).

lead our courts to question whether independent directors or voting shareholders can freely exercise their judgment in approving transactions sponsored by the controller."[86] In these circumstances, the minority stockholders are entitled to entire fairness review.

To the extent that *Sinclair* requires that a plaintiff plead the existence of a detriment to minority stockholders to give rise to entire fairness review, the power dynamics in negotiations between a controller and its controlled corporation render a detriment reasonably conceivable.

On this point, *Digex* is instructive. There, the minority stockholders of Digex, Inc. sought to enjoin a merger between Digex's parent-controller, Intermedia Communications, Inc., and third-party WorldCom, Inc.[87] To consummate the merger, WorldCom and Intermedia requested that Digex waive the anti-takeover protections afforded under Section 203 of the Delaware General Corporation Law.[88] The majority of the Digex directors, who also sat on the board of Intermedia and had "direct, personal financial interests in the proposed transaction," approved the waiver.[89] The plaintiffs claimed that the interested directors breached their fiduciary obligations by approving the waiver. On a preliminary injunction record, the court applied the entire fairness standard to the plaintiffs' Section 203 claim and found that the plaintiffs were likely to succeed on the

---

[86] *In re Tesla Motors, Inc. S'holder Litig.*, 2020 WL 553902, at *6 (Del. Ch. Feb. 4, 2020).

[87] *Digex*, 789 A.2d at 1179–80.

[88] *Id.* at 1197–98.

[89] *Id.* at 1207.

claim.[90]   The court reasoned that the request for the waiver presented "Digex with bargaining leverage against Intermedia and WorldCom," and that the "leverage simply was not used."[91]   The failure to use leverage on behalf of the minority, standing alone, constituted a detriment to the minority.

In this case, as in *Digex*, the Founders stood to gain a unique benefit from Tilray. As Intermedia and WorldCom needed the Digex board's approval of the Section 203 waiver to complete the merger, the Founders needed the Board's approval of the downstream merger, stock cancellation, and stock issuance to effectuate the second step of the Reorganization and obtain the corresponding tax benefits.   Based on these unique benefits alone, Plaintiffs are entitled to entire fairness review.   To the extent *Sinclair* requires that Plaintiffs allege a detriment, they have done so:  it is reasonably conceivable that the Tilray board failed to exert leverage over Privateer and the Founders in the Reorganization negotiations to the detriment of Tilray and its minority stockholders.

### B.    Motion to Dismiss Count II Pursuant to Rule 23.1

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[92]   "In a derivative suit, a stockholder

---

[90] *Id.* at 1206–14.

[91] *Id.* at 1214.

[92] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review.  *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996);

seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[93] Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[94] The demand requirement is a substantive principle under Delaware law.[95] Rule 23.1 is the "procedural embodiment of this substantive principle."[96]

Under Rule 23.1, stockholder plaintiffs must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[97] Stockholders choosing to allege demand futility must meet the

---

*Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253-54. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

[93] *United Food and Com. Workers Union v. Zuckerberg*, 2020 WL 6266162, at *7 (Del. Ch. Oct. 26, 2020).

[94] *Id.*

[95] *Id.*; *see* Ct. Ch. R. 23.1(a).

[96] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[97] Ct. Ch. R. 23.1(a).

"heightened pleading requirements,"[98] alleging "particularized factual statements that are essential to the claim."[99] "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences."[100]

Delaware courts apply one of two tests in evaluating whether demand is futile. As the Delaware Supreme Court has held:

> Demand futility under Rule 23.1 must be determined pursuant to either the standards articulated in *Aronson v. Lewis* or those set forth in *Rales v. Blasband*. . . . In *Rales v. Blasband*, this Court identified three circumstances in which the *Aronson* standard will not be applied: "(1) where a business decision was made by the board of a company, but a majority of the directors making the decision has been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation."[101]

Given developments in Delaware jurisprudence since *Aronson* was decided in 1983, the soundness of its theoretical justifications is questionable.[102] Still, the *Aronson* test remains binding law, and because Tilray's Board composition at the time the Amended

---

[98] *Zuckerberg*, 2020 WL 6266162, at *8.

[99] *Brehm*, 746 A.2d at 254.

[100] *Id.* at 255.

[101] *Braddock v. Zimmerman*, 906 A.2d 776, 784–85 (Del. 2006) (second ellipses in original) (first citing *Aronson*, 473 A.2d at 813, and then quoting *Rales*, 634 A.2d at 934).

[102] *See generally Zuckerberg*, 2020 WL 6266162, at *9–19 (assessing the obsolescence of *Aronson* and concluding that *Rales* articulates a more "broad and flexible" test that "encompasses the *Aronson* test as a special case").

Complaint was filed is identical to its composition at the time of the Reorganization, the *Aronson* test governs this analysis.[103]

"Under the two-part *Aronson* test, demand will be excused if the derivative complaint pleads particularized facts creating a reasonable doubt that '(1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'"[104]

The first inquiry looks to the independence and disinterestedness of the directors with respect to the challenged transaction.[105] The second inquiry has been interpreted to "requir[e] *both* that a standard more onerous than the business judgment applies *and* that a majority of the directors face a substantial likelihood of liability on a non-exculpated claim."[106]

This court evaluates demand futility on a director-by-director basis, determining whether a majority of the board of directors could consider a demand by "count[ing] heads."[107] Because five directors comprise the Board, the Amended Complaint "must

---

[103] *See* Tilray Opening Br. at 38 (noting that "the composition of the Board at the time of the filing of the Amended Complaint is the same as it was when Tilray approved the Reorganization").

[104] *Braddock*, 906 A.2d at 784 (quoting *Rales*, 634 A.2d at 933).

[105] *Hughes v. Xiaoming Hu*, 2020 WL 1987029, at *11 (Del. Ch. Apr. 27, 2020).

[106] *See Zuckerberg*, 2020 WL 6266162, at *15 (emphasis added); *see also id.* at *9–16 (explaining that this is likely not what the *Aronson* court had in mind when fashioning the rule).

[107] *Ezcorp*, 2016 WL 301245, at *34.

plead facts that create a reason to doubt that at least three of these five individuals are disinterested or independent."[108]

Defendants do not contest that Kennedy is conflicted for demand excusal purposes, nor could they—as the largest stockholder of Privateer and as CEO and Chairman of both Privateer's and Tilray's boards, it is reasonable to doubt his ability to impartially consider a demand.[109] Plaintiffs do not contest that Dopp and St. Clare were independent and disinterested for demand excusal purposes. Thus, this analysis focuses on Auerbach and Greenwood.

Plaintiffs advance many theories challenging Auerbach's disinterest and independence. One does the trick. Plaintiffs allege that Auerbach served as a director of both Privateer and Tilray.[110] As a Privateer director, Auerbach owed fiduciary obligations to Privateer and its stockholders.[111] "[I]ndividuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary," owe the same fiduciary duties to both corporations and must act "in light of what is best for both

---

[108] *See In re BGC P'rs., Inc.*, 2019 WL 4745121, at *9 (Del. Ch. Sept. 30, 2019) (finding that demand was excused where the majority of a five-person board lacked independence from a controller); *see also Ezcorp*, 2016 WL 301245, at *34 ("To determine whether the Board could properly consider a demand, a court counts heads. If the board of directors lacks a majority comprising independent and disinterested directors, then demand is futile.").

[109] *See* Am. Compl. ¶ 16; Tilray Opening Br. at 39.

[110] Am. Compl. ¶ 177.

[111] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 ("It is well settled that directors owe fiduciary duties to the corporation." (citing *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939))).

companies."[112] Where those corporations negotiate on opposite sides of a transaction, and thus have divergent interests, the dual fiduciary faces an inherent conflict of interest with respect to that transaction.[113] In this case, Privateer and Tilray were on opposite sides of the negotiating table, rendering Auerbach conflicted with respect to the Reorganization.

Plaintiffs likewise advance multiple theories challenging Greenwood's disinterest and independence. Again, one does the trick. The Amended Complaint adequately alleges that Greenwood was beholden to the Founders and Privateer due to her employment with Crestview. Plaintiffs allege that the Founders controlled Privateer and indirectly Tilray, both of which generated substantial business for Crestview. Specifically, the Amended Complaint notes that Privateer and Tilray have engaged Crestview since at least 2015 and that Crestview has lobbied on Tilray's behalf in favor of legalized and regulated recreational and medical cannabis.[114]

Plaintiffs support their allegation that Privateer and Tilray generated substantial business for Crestview's Canadian operations by pointing to the number of lobbying registrations filed by Crestview with the Canadian government.[115] It is reasonably

---

[112] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710–11 (Del. 1983) (citing *Warshaw v. Calhoun*, 221 A.2d 487, 492 (Del. 1966)).

[113] *See, e.g., Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *25–33 (Del. Ch. Apr. 14, 2017) (finding that because the "allegations support a reasonable inference that the" dual fiduciaries furthered one entity's interests over the other, they could not "be considered disinterested or independent for purposes of determining the standard of review").

[114] *See* Am. Compl. ¶¶ 34, 36, 38.

[115] *See id.* ¶¶ 36–38.

conceivable, based on these filings, that Crestview "depends on the patronage of Tilray and Privateer" as important clients.[116]  If Crestview depends on the patronage of entities controlled by the Founders, it is reasonably conceivable that the head of Crestview's U.S. office felt beholden to the Founders.

Defendants dispute this conclusion, arguing that Plaintiffs have not sufficiently alleged that the Founders' business is material to Crestview.[117]  Yet, on this Rule 23.1 pleadings-stage motion, Plaintiffs are entitled to the reasonable inferences that logically flow from particularized facts pled in the Amended Complaint.[118]  Given the volume of work performed by Crestview on behalf of Privateer and Tilray, it is reasonable to infer that Privateer and Tilray were material clients for Crestview and Greenwood.

In light of the particularized facts pled as to Auerbach and Greenwood, and because Defendants do not dispute that Kennedy also could not impartially consider a demand, the Amended Complaint has adequately pled that demand on the Board would have been futile. Demand is therefore excused and Defendants' motions to dismiss pursuant to Court of Chancery Rule 23.1 is denied.

---

[116] *Id.* ¶¶ 39.

[117] *See* Greenwood Opening Br. at 33–40; Tilray Opening Br. at 40–47.

[118] *See Marchand v. Barnhill*, 212 A.3d 805, 819–20 (Del. 2019) (stating that this court is "bound to accord the plaintiff the benefit of all reasonable inferences" at the pleading stage and finding that a significant business relationship supported a pleading-stage inference that a director was incapable of impartially considering demand).

## C. Motion to Dismiss Groh and Blue for Lack of Personal Jurisdiction

"When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[119] "In ruling on a 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record," but where "no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction" on a record construed "in the light most favorable to the plaintiff."[120]

Delaware courts use a two-step analysis to resolve questions of personal jurisdiction.[121] First, the court must "determine that service of process is authorized by statute."[122] Second, the defendant must have certain minimum contacts with Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."[123]

Plaintiffs argue that this court has personal jurisdiction over Groh and Blue under Delaware's Long-Arm Statute based on the conspiracy theory of jurisdiction.[124]

---

[119] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003))

[120] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 800–01 (Del. Ch. 2020) (quoting *Ryan*, 935 A.2d at 265).

[121] *Ryan*, 935 A.2d at 265.

[122] *Id.*

[123] *Matthew v. FläktWoods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)).

[124] Pls.' Answering Br. at 54–59.

Delaware's Long-Arm statute provides jurisdiction over a nonresident "who in person or through an agent . . . [t]ransacts any business or performs any character of work or service in the State . . . [or] [c]auses tortious injury in the State by an act or omission in this State."[125] "[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction."[126] "Under the plain language of the Long-Arm Statute, forum-directed activity can be accomplished 'through an agent.'"[127]

The Delaware Supreme Court has adopted the conspiracy theory of jurisdiction, under which a person's co-conspirators are their agents, such that forum-directed activities by the co-conspirator can give rise to personal jurisdiction over all conspiracy members.[128] At the pleading stage, a plaintiff need not "produce direct evidence of a conspiracy" but must assert "specific facts from which one can reasonably infer that a conspiracy existed."[129]

The Delaware Supreme Court established the elements of the conspiracy theory of jurisdiction in *Istituto Bancario Italiano SpA v. Hunter Engineering Co.*:

> [A] conspirator who is absent from the forum state is subject to the jurisdiction of the court . . . if the plaintiff can make a factual showing that: (1) a conspiracy . . . existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had

---

[125] 10 *Del. C.* § 3014(c).

[126] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000).

[127] *Virtus Cap. L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *11 (Del. Ch. Feb. 11, 2015) (quoting 10 *Del. C.* § 3104(c)).

[128] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 222 (Del. 1982).

[129] *Reid v. Siniscalchi*, 2014 WL 6589342, at *6 (Del. Ch. Nov. 20, 2014).

reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[130]

The five elements of the *Istituto Bancario* test "functionally encompass both prongs of the jurisdictional test."[131] "The first three . . . elements address the statutory prong . . . . The fourth and fifth . . . elements address the constitutional prong . . . ."[132]

The first and second *Istituto Bancario* elements ask whether a conspiracy existed and whether the nonresidents were members of the conspiracy. "Although *Istituto Bancario* literally speaks in terms of a 'conspiracy to defraud,' the principle is not limited to that particular tort."[133] This court has recognized that a breach of fiduciary duty can supply the relevant tort, and that control group theories—like aiding and abetting claims— are a "context-specific application of civil conspiracy law."[134] Where a complaint adequately alleges the legally significant connection required to support a control group claim, then the first and second elements of the *Istituto Bancario* test will be met as to the control group members.[135] Because the Amended Complaint adequately alleges that Groh and Blue are control group members, the first *Istituto Bancario* elements are met here.

---

[130] *Perry v. Neupert*, 2019 WL 719000, at *22 (Del. Ch. Feb. 15, 2019) (quoting *Istituto Bancario*, 449 A.2d at 225).

[131] *Virtus*, 2015 WL 580553, at *12.

[132] *Id.*

[133] *Id.* at *13.

[134] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006).

[135] *See, e.g., Virtus*, 2015 WL 580553, at *13–14 (exercising personal jurisdiction over the "top dog and ring leader" under the conspiracy theory but noting that "[s]ufficiently

Groh and Blue dispute that the formation of a control group is sufficient to establish a conspiracy under *Istituto Bancario*.[136] They base their argument on the case law providing that "[a] corporation cannot conspire with itself."[137] But Defendants cite to no case endorsing the intra-corporate immunity doctrine as a basis for a fiduciary to avoid personal jurisdiction. And multiple cases of this court have implicitly rejected the notion by exercising jurisdiction over control group members under the conspiracy theory. The intra-corporate immunity principle is typically invoked to shield directors and officers of a corporation from contract and tort claims asserted by third parties, where public policy favors shielding fiduciaries from damages taken in their relevant capacities.[138] That policy

---

pleading a claim for breach of fiduciary duty and a related claim for aiding and abetting a breach of fiduciary duty satisfies the first and second elements of the *Istituto Bancario* test"); *Perry v. Neupert*, 2017 WL 6033498, at *16–17 (Del. Ch. Dec. 6, 2017) (finding the first two *Istituto Bancario* elements met where there was a "sufficient basis to believe that [the defendants] conspired to engage in tortious conduct" by "act[ing] in concert" and "receiv[ing] the benefit of [the co-conspirator's] actions"); *Gilbralt Cap. Corp. v. Smith*, 2001 WL 647837, at *6 (Del. Ch. May 9, 2001) (applying the *Istituto Bancario* test to a "member of the conspiracy" who "fil[ed] a certificate of designation" that "allowed the defendants to take other wrongful acts"); *see also RCS Cred. Tr. v. Schorsch*, 2018 WL 1640169, at *6 & n.72 (Del. Ch. Apr. 5, 2018) (collecting authorities and finding a claim for aiding and abetting, pled in the alternative to a control group claim, reasonably conceivable given the factual overlap of both analyses).

[136] *See* Groh & Blue Reply Br. at 24–27.

[137] *Id*. at 24–25 (quoting *Anschultz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *17 (Del. Ch. June 11, 2020)).

[138] *See, e.g.*, *Anschultz*, 2020 WL 3096744, at *17–18 (dismissing an aiding and abetting claim against corporate officers who acted collectively to fraudulently "inflat[e] the value of OnRamp for their principal" because "as a general rule, agents of a corporation cannot conspire with one another or aid and abet each other's torts" when acting on behalf of the corporate entity, which is inapplicable only "when a corporate officer 'steps out of a her corporate role and acts pursuant to personal motives'" (quoting *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006))).

does not translate to internal affairs claims where stockholders seek to hold fiduciaries accountable, and this decision declines to import it to that context.

The third element of the *Istituto Bancario* test requires a substantial act in the forum state.[139] "The formation of a Delaware entity or the filing of a corporate instrument in Delaware to facilitate the challenged transaction satisfies [the third *Istituto Bancario* factor]."[140] Blue filed Privateer's charter amendment, a corporate instrument, in Delaware and that filing is attributable to Blue's co-conspirators.[141] Blue signed an amendment to Privateer's Charter, an amendment that allowed the Founders—including Groh and Blue—to obtain all of Tilray's Class 1 stock in the Reorganization. The Amended Complaint sufficiently alleges that this filing was integral to the challenged transaction, as the Founders conditioned the transaction on its approval.[142]

---

[139] *Istituto Bancario*, 449 A.2d at 225.

[140] *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *14 (Del. Ch. Oct. 28, 2011) (alteration in original); *see also Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1196 (Del. Ch. 2010) ("Forming a Delaware entity for the purpose of engaging in a transaction constitutes the "transaction of business" within the State of Delaware sufficient to confer specific personal jurisdiction over the party forming the entity under Section 3104(c)(1).").

[141] *See Virtus*, 2015 WL 580553, at *15 (collecting cases in which "[t]he Delaware Supreme Court has held . . . that one conspirator's acts are attributable to the other conspirators" and attributing the filing of a certificate of merger by one actor to their co-conspirators (internal quotation marks omitted)). Plaintiffs cite to "three such documents," including Privateer's charter amendment signed by Blue, the merger certificate signed by Kennedy, and Tilray's charter amendment, also signed by Kennedy. Pls.' Opening Br. at 57; *see Crescent/Mach*, 846 A.2d at 977 ("The act of merger, itself, was a substantial act in furtherance of the plan and it occurred in Delaware.").

[142] *See* Am. Compl. ¶¶ 10, 80, 125, 153. The filing of the amended charters was a condition to closing. *See* Seal Decl. Ex. 12 § 6.6.

The fourth and fifth *Istituto Bancario* elements require that Groh and Blue knew or had reason to know of the filing of the corporate instruments in Delaware and that the filing was a direct and foreseeable result of the conduct in furtherance of the Reorganization.[143] The Amended Complaint satisfies these two factors. Blue personally signed the amendment to Privateer's charter, which inferably furthered the Founders' interests in the Reorganization. As members of the control group, it is reasonably conceivable that both Groh and Blue knew or had reason to know that those corporate instruments were filed in Delaware in connection with the Reorganization.

Plaintiffs have adequately pled each factor of the *Istituto Bancario* test, thus establishing personal jurisdiction over Groh and Blue under *Istituto Bancario*.[144]

## III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Amended Complaint are DENIED.

---

[143] *See Istituto Bancario*, 449 A.2d at 225.

[144] Having found an adequate basis for personal jurisdiction, the court need not address Plaintiffs' additional theories. Groh and Blue additionally argue that Plaintiffs' service of process upon them was insufficient. Groh & Blue Opening Br. at 34. Their argument depends entirely on Plaintiffs' alleged failure to satisfy "the statutory and constitutional requirements to establish personal jurisdiction on Groh and Blue." *Id.* Because the court has personal jurisdiction over Groh and Blue, their sufficiency of process argument fails.